# United States Court of Appeals

### For the Eighth Circuit

_____

No. 14-2128

_____

MKB Management Corp., doing business as Red River Women's Clinic; Kathryn
L. Eggleston, M.D.

*Plaintiffs - Appellees*

v.

Wayne Stenehjem, in his official capacity as Attorney General for the State of
North Dakota; Larry Johnson, M.D.; Robert Tanous, D.O.; Kate Larson, P.A.C.;
Norman Byers, M.D.; Cory Miller, M.D.; Kayleen Wardner; Gaylord J. Kavlie,
M.D.; Kent Martin, M.D.; Kent Hoerauf; Burt L. Riskedahl; Jonathan Haug, M.D.;
Genevieve Goven, M.D.; Robert J. Olson, M.D., in their official capacities as
members of the North Dakota Board of Medical Examiners

*Defendants - Appellants*

Birch Burdick, in his official capacity as State Attorney for Cass County

*Defendant*

------------------------------

Foundation for Moral Law; Lutherans for Life; Women Injured by Abortion; An
Abortion Survivor - Dawn Milberger and Sandra Cano; The Former "Mary Doe"
of "Doe v. Bolton"

*Amici on Behalf of Appellant(s)*

American Psychological Association; American Public Health Association;
American College of Obstetricians and Gynecologists; Physicians for
Reproductive Health; Program for the Study of Reproductive Justice - Information

Society Project at the Yale Law School

*Amici on Behalf of Appellee(s)*

_____

Appeal from United States District Court
for the District of North Dakota - Bismarck

_____

Submitted: January 13, 2015
Filed: July 22, 2015

_____

Before SMITH, BENTON, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

This case presents the question whether, given the current state of medical science, a state generally may prohibit physicians from aborting unborn children who possess detectable heartbeats. The district court[1] held that it may not. Because United States Supreme Court precedent does not permit us to reach a contrary result, we affirm.

I.

North Dakota has, for a number of years, prohibited abortion "[a]fter the point in pregnancy when the unborn child may reasonably be expected to have reached viability," except when necessary to preserve the life or health of the mother. N.D. Cent. Code § 14-02.1-04(3). North Dakota defines "viable" as "the ability of an

_____

[1]The Honorable Daniel L. Hovland, United States District Judge for the District of North Dakota.

unborn child to live outside the mother's womb, albeit with artificial aid." Id. § 14-02.1-02(19).

In 2013, North Dakota passed House Bill 1456, codified at N.D. Cent. Code § 14-02.1, which extends the general prohibition on abortion to the point in pregnancy when the unborn child possesses a detectable heartbeat. H.B. 1456 contains two operative provisions. The first requires a physician performing an abortion to "determin[e], in accordance with standard medical practice, if the unborn child the pregnant woman is carrying has a detectable heartbeat." H.B. 1456 § 1.1, 63d Leg. Assemb., Reg. Sess. (N.D. 2013). This requirement does not apply "when a medical emergency exists that prevents compliance." Id.; see also N.D. Cent. Code § 14-02.1-02(12) (defining "medical emergency"). A physician who violates the heartbeat testing requirement is subject to disciplinary action before the state board of medical examiners. See H.B. 1456 § 1.2.

The second operative provision prohibits a physician from performing an abortion on a pregnant woman if the unborn child has a "heartbeat [that] has been detected according to the requirements of section 1." Id. § 2.1. There are exceptions for the life or health of the pregnant woman and for the life of another unborn child. Id. § 2.2(a). A physician who violates this provision commits a felony. Id. § 2.4. The pregnant woman, however, is not subject to liability. Id.

Plaintiff MKB Management Corporation, doing business as the Red River Women's Clinic, is the sole abortion provider in North Dakota. Plaintiff Dr. Kathryn Eggelston is a board-certified family medicine physician, licensed to practice in North Dakota, who serves as the Clinic's medical director and provides abortions to the Clinic's patients. The defendants are the State's Attorney for the county in which the Clinic is located, the North Dakota Attorney General, and the members of the North Dakota Board of Medical Examiners, all in their official capacities (collectively, the "State").

Before H.B. 1456 took effect, the plaintiffs brought suit in the district court, challenging the law's constitutionality and seeking injunctive relief. The district court granted a preliminary injunction enjoining the implementation of H.B. 1456. The plaintiffs then moved for summary judgment, arguing H.B. 1456 violates the Due Process Clause of the United States Constitution. The plaintiffs submitted declarations from Dr. Eggleston and Dr. Christie Iverson, a board-certified obstetrician and gynecologist licensed in North Dakota, both stating that fetal cardiac activity is detectable by about 6 weeks and that a fetus is not viable until about 24 weeks.[2] In response, the State submitted the declaration of Dr. Jerry Obritsch, a board-certified obstetrician and gynecologist licensed in North Dakota, that an unborn child's heartbeat is detectable by about 6 to 8 weeks and that an unborn child is viable from conception because in vitro fertilization ("IVF")[3] "allow[s] an embryonic unborn child to live outside the human uterus (womb) for 2 - 6 days after conception." Obritsch Dec. at 8.

The district court found that "[a] woman's constitutional right to terminate a pregnancy before viability has consistently been upheld by the United States Supreme Court for more than forty years since Roe v. Wade." MKB Mgmt. Corp. v. Burdick, 16 F. Supp. 3d 1059, 1070 (D.N.D. 2014). It reasoned that "the affidavit of Dr. Obritsch does not create a genuine issue [as to when viability occurs] primarily because Dr. Obritsch uses a different definition of viability than the one used by either the United States Supreme Court or the medical community generally." Id. at

---

[2]Dr. Iverson further explained that "[p]regnancy is commonly measured by the number of days that have passed since the first day of a woman's last menstrual period." Iverson Dec. at 2.

[3]Dr. Obritsch described IVF as a common practice in which embryonic unborn children live outside the woman's uterus through artificial means before being transferred into the uterus to continue gestation. He noted a colloquial term for these children is "test tube babies." Obritsch Dec. at 8.

1073. Concluding that "H.B. 1456 clearly prohibits pre-viability abortions in a very significant percentage of cases in North Dakota, thereby imposing an undue burden on women seeking to obtain an abortion," the district court granted summary judgment to the plaintiffs, permanently enjoining H.B. 1456. Id. at 1074-75. The State now appeals.

II.

We review the district court's grant of summary judgment de novo and its permanent injunction for an abuse of discretion. Roach v. Stouffer, 560 F.3d 860, 863 (8th Cir. 2009).

The State argues that the Supreme Court has called into question the continuing validity of its abortion jurisprudence, see Gonzales v. Carhart, 550 U.S. 124, 146 (2007) (merely assuming, rather than reaffirming, the principles established in prior cases), and that changes in the facts underlying Roe and Casey require us to overturn those cases.

The evolution in the Supreme Court's jurisprudence reflects its increasing recognition of states' profound interest in protecting unborn children. In 1973, the Court announced it would regulate abortion according to the trimester framework. Roe v. Wade, 410 U.S. 113, 164-65 (1973). Although Roe acknowledged there were "important state interests in regulation," it prohibited states from issuing regulations designed to promote their interest in "protecting potential life" during the first two trimesters of pregnancy. Id. at 154, 164.

By 1992, however, a plurality of the Court had rejected the trimester framework because it failed to "fulfill Roe's own promise that the State has an interest in protecting fetal life or potential life." Planned Parenthood of Se. Pa v. Casey, 505 U.S. 833, 876 (1992). Casey recognized "there is a substantial state

interest in potential life throughout pregnancy." Id. (plurality opinion). To give this interest due consideration, Casey replaced Roe's trimester framework with the undue burden analysis, under which a state may promote its interest in potential life by regulating abortion before viability so long as the regulation's "purpose or effect is [not] to place a substantial obstacle in the path of a woman seeking an abortion." Id. at 878 (plurality opinion).

Most recently, a majority of the Court, when presented with an opportunity to reaffirm Casey, chose instead merely to "assume" Casey's principles for the purposes of its opinion. See Gonzales, 550 U.S. at 145-46 ("assum[ing] the following principles [from Casey] for the purposes of this opinion," but recognizing those principles "did not find support from all those who join the instant opinion"); see also id. at 186-87 (Ginsburg, J., dissenting) (observing that "[t]he Court's hostility to the right Roe and Casey secured" is evident in the fact that the Court "merely assume[d] for the moment, rather than retained or reaffirmed," Casey's principles (second alteration in original) (citation and internal quotation marks omitted)). This mere assumption may, as the State suggests, signal the Court's willingness to reevaluate its abortion jurisprudence.

Even so, the Court has yet to overrule the Roe and Casey line of cases. Thus we, as an intermediate court, are bound by those decisions. Neither Gonzales's signal nor the alleged change of underlying facts empowers us to overrule the Supreme Court. See Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484 (1989) (emphasizing that only the Supreme Court may overturn its own precedent).

Accordingly, we have no choice but to follow the majority of the Court in assuming the following principles for the purposes of this opinion:

Before viability, a State "may not prohibit any woman from making the ultimate decision to terminate her pregnancy." It also may not impose

upon this right an undue burden, which exists if a regulation's "purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." On the other hand, "[r]egulations which do no more than create a structural mechanism by which the State, or the parent or guardian of a minor, may express profound respect for the life of the unborn are permitted, if they are not a substantial obstacle to the woman's exercise of the right to choose."

Gonzales, 550 U.S. at 146 (alteration in original) (citations omitted) (quoting Casey, 505 U.S. at 879, 878, and 877 (plurality opinion)).

Here, because the parties do not dispute that fetal heartbeats are detectable at about 6 weeks, it is clear that H.B. 1456 generally prohibits abortions after that point in a pregnancy. Whether such a prohibition is permissible under the principles we accept as controlling in this case depends on when viability occurs: if viability occurs at about 24 weeks, as the plaintiffs maintain, then H.B. 1456 impermissibly prohibits women from making the ultimate decision to terminate their pregnancies; but if viability occurs at conception, as the State argues, then no impermissible prohibition ensues.

Just as we are bound by the Supreme Court's assumption of Casey's principles, we are also bound by the Court's statement that viability is the time "when, in the judgment of the attending physician on the particular facts of the case before him, there is a reasonable likelihood of the fetus' sustained survival outside the womb, with or without artificial support." Colautti v. Franklin, 439 U.S. 379, 388 (1979); see also Casey, 505 U.S. at 870 (plurality opinion) ("[T]he concept of viability . . . is the time at which there is a realistic possibility of maintaining and nourishing a life outside the womb . . . ."); Roe, 410 U.S. at 160, 163 (stating that a fetus becomes viable when it is "potentially able to live outside the mother's womb, albeit with artificial aid" and that viability is the point at which the fetus "presumably has the capability of meaningful life outside the mother's womb").

When we recently reviewed an Arkansas statute similar to H.B. 1456, we noted "the importance of the parties, particularly the state, developing the record in a meaningful way so as to present a real opportunity for the court to examine viability." Edwards v. Beck, 786 F.3d 1113, 1119 (8th Cir. 2015) (per curiam).  Here, the plaintiffs' declarations, by Drs. Eggleston and Iverson, state viability occurs at about 24 weeks.  Dr. Iverson explained she understands viability to mean "the time when a fetus has a reasonable chance for sustained life outside the womb, albeit with lifesaving medical intervention." Iverson Dec. at 2.  This definition is in accordance with the one adopted by the Supreme Court.

The State's declaration, by Dr. Obritsch, contends viability occurs at conception because IVF "allow[s] an embryonic unborn child to live outside the human uterus (womb) for 2 - 6 days after conception." Obritsch Dec. at 8.  While this declaration provides some support for the State's argument, we agree with the district court that Dr. Obrtisch's definition of viability differs from the Supreme Court's and thus does not create a genuine dispute as to when viability occurs.  See Churchill Bus. Credit, Inc. v. Pac. Mut. Door Co., 49 F.3d 1334, 1336 (8th Cir. 1995) ("A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986))).

Because there is no genuine dispute that H.B. 1456 generally prohibits abortions before viability—as the Supreme Court has defined that concept—and because we are bound by Supreme Court precedent holding that states may not prohibit pre-viability abortions, we must affirm the district court's grant of summary judgment to the plaintiffs.  See Fed. R. Civ. P. 56(a) ("The court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").[4]

## III.

Although controlling Supreme Court precedent dictates the outcome in this case, good reasons exist for the Court to reevaluate its jurisprudence. See City of Akron v. Akron Ctr. for Reprod. Health, Inc., 462 U.S. 416, 458 (1983) (O'Connor, J., dissenting) ("Although [the Court] must be mindful of the 'desirability of continuity of decision in constitutional questions . . . when convinced of former error, [the] Court has never felt constrained to follow precedent.'" (quoting Smith v. Allwright, 321 U.S. 649, 665 (1944))).

## A.

To begin, the Court's viability standard has proven unsatisfactory because it gives too little consideration to the "substantial state interest in potential life throughout pregnancy." Casey, 505 U.S. at 876 (plurality opinion). By deeming viability "the point at which the balance of interests tips," id. at 861, the Court has tied a state's interest in unborn children to developments in obstetrics, not to developments in the unborn. This leads to troubling consequences for states seeking to protect unborn children. For example, although "states in the 1970s lacked the power to ban an abortion of a 24-week-old-fetus because that fetus would not have satisfied the viability standard of that time, [t]oday . . . that same fetus would be

---

[4]The State also appeals the district court's affirmance of a magistrate judge's order limiting discovery to the issue of viability. Because viability presents the central issue in this case, the district court did not err in affirming the magistrate judge's order. See Admiral Theatre Corp. v. Douglas Theatre Co., 585 F.2d 877, 889 (8th Cir. 1978) (noting that a district court must be allowed the discretion to limit the scope of discovery "to what the court perceived were the central issues").

considered viable, and states would have the power to restrict [such] abortions." Edwards, 786 F.3d at 1118 (final alteration in original) (citation and internal quotation marks omitted). How it is consistent with a state's interest in protecting unborn children that the same fetus would be deserving of state protection in one year but undeserving of state protection in another is not clear. The Supreme Court has posited there are "logical and biological justifications" for choosing viability as the critical point. Roe, 410 U.S. at 163. But this choice is better left to the states, which might find their interest in protecting unborn children better served by a more consistent and certain marker than viability. Here, the North Dakota legislature has determined that the critical point for asserting its interest in potential life is the point at which an unborn child possesses a detectable heartbeat. "To substitute its own preference to that of the legislature in this area is *not* the proper role of a court." Edwards, 786 F.3d at 1119.

By taking this decision away from the states, the Court has also removed the states' ability to account for "advances in medical and scientific technology [that] have greatly expanded our knowledge of prenatal life," Hamilton v. Scott, 97 So. 3d 728, 742 (Ala. 2012) (Parker, J., concurring specially), including that "a baby develops sensitivity to external stimuli and to pain much earlier than was . . . believed [when Roe was decided]." McCorvey v. Hill, 385 F.3d 846, 852 (5th Cir. 2004) (Jones, J., concurring). "[B]ecause the Court's rulings have rendered basic abortion policy beyond the power of our legislative bodies, the arms of representative government may not meaningfully debate" medical and scientific advances. Id. (Jones, J., concurring). Thus the Court's viability standard fails to fulfill Roe's "promise that the State has an interest in protecting fetal life or potential life." Casey, 505 U.S. at 876 (plurality opinion).

Medical and scientific advances further show that the concept of viability is itself subject to change. The Court has already acknowledged that viability continues to occur earlier in pregnancy. See Casey, 505 U.S. at 860. When the Court decided

Roe in 1973, viability generally occurred at 28 weeks. Roe, 410 U.S. at 160. In 1992, viability "sometimes" occurred at 23 to 24 weeks. Casey, 505 U.S. at 860. Today, viability generally occurs at 24 weeks, but it may occur weeks earlier. See Matthew A. Rysavy, B.S., et al., Between-Hospital Variation in Treatment and Outcomes in Extremely Preterm Infants, 372 New England Journal of Medicine 1801 (2015) (documenting survival rates of infants born at 22 weeks); see also Edwards, 786 F.3d at 1119 (discussing the case of Amillia Taylor, who survived after being born at 21 weeks). Dr. Obritsch's declaration, although insufficient to create a genuine dispute of fact in the face of the Supreme Court's current definition of viability, shows the concept of viability may be attacked from the point of conception forward, as well. As IVF and similar technologies improve, we can reasonably expect the amount of time an "embryonic unborn child" may survive outside the womb will only increase. The viability standard will prove even less workable in the future.

B.

Another reason for the Court to reevaluate its jurisprudence is that the facts underlying Roe and Casey may have changed. The State has presented evidence to that effect and the plaintiffs did not contest this evidence at the summary judgment stage. The State's evidence "goes to the heart of the balance Roe struck between the choice of a mother and the life of her unborn child." McCorvey, 385 F.3d at 850 (Jones, J., concurring). First, "Roe's assumption that the decision to abort a baby will be made in close consultation with a woman's private physician is called into question by" declarations from women who have had abortions. Id. at 851 (Jones, J., concurring). These declarations state women may receive abortions without consulting the physician beforehand and without receiving follow-up care after, see, e.g., J.A. 1550, that women may not be given information about the abortion procedure or its possible complications, see, e.g., J.A. 1541, and that the abortion clinic may function "like a mill." J.A. 1556. The declaration by Dr. John Thorp, a board-certified obstetrician and gynecologist, further states that "coercion or pressure

-11-

prior to the termination of pregnancy occurs with frequency." J.A. 973. One woman declared her husband threatened to kick her out of the house and take her children away forever if she did not abort a pregnancy that was the product of an affair. J.A. 1555.

The declarations from women who have had abortions also show abortions may cause adverse consequences for the woman's health and well-being. One woman reported that "[t]he negative effects of my abortion resulted in ten years of mental and emotional torment." J.A. 1533. Another reported she "suffered for years from depression, anxiety, panic attacks, low self esteem" and "suicidal ideation." J.A. 1519. Yet another reported her abortion caused "numerous female health issues, including an ectopic pregnancy, chronic bladder infections, debilitating menstrual cycles, cervical cancer and early hysterectomy." J.A. 1525. Dr. Obritsch also explained some studies support a connection between abortion and breast cancer. J.A. 340.

We further observe that the pseudonymously named plaintiffs in two of the Supreme Court's foundational abortion cases later advocated against those very decisions. Norma McCorvey, the "Jane Roe" of Roe v. Wade, sought relief from the judgment in her case on the ground that changed factual and legal circumstances rendered Roe unjust. See McCorvey, 385 F.3d at 850 (affirming denial of McCorvey's Federal Rule of Civil Procedure 60(b) motion). Sandra Cano, the "Mary Doe" of Doe v. Bolton, 410 U.S. 179 (1973), Roe's companion case, similarly sought relief from the judgment in her case. See Cano v. Baker, 435 F.3d 1337, 1342 (11th Cir. 2006) (per curiam) (affirming denial of Cano's Rule 60(b) motion). Cano also filed an amicus brief in this case arguing "that abortion is psychologically damaging to the mental and social health of significant numbers of women." Women Injured By Abortion, et al., Br. of *Amici Curiae*, at 5; see also Gonzales, 550 U.S. at 159 (citing Cano's amicus brief in that case). McCorvey's and Cano's renunciations call

into question the soundness of the factual assumptions of the cases purportedly decided in their favor.

Finally, the State argues that, by enacting a law that permits parents to abandon unwanted infants at hospitals without consequence, it has reduced the burden of child care that the Court identified in Roe. See N.D. Cent. Code § 50-24.1-15; Roe, 410 U.S. at 153 ("Mental and physical health may be taxed by child care. There is also the distress, for all concerned, associated with the unwanted child, and there is the problem of bringing a child into a family already unable, psychologically and otherwise, to care for it.").

In short, the continued application of the Supreme Court's viability standard discounts the legislative branch's recognized interest in protecting unborn children.

IV.

For the foregoing reasons, we affirm the district court's grant of summary judgment to the plaintiffs[5] and the permanent injunction of H.B. 1456.[6]

————————————————

[5]Because we affirm the grant of summary judgment to the plaintiffs, we decline to address the parties' arguments about whether H.B. 1456 violates the Equal Protection Clause.

[6]Although the North Dakota Century Code contains a presumptive severability clause, see N.D. Cent. Code § 1-02-20, we decline to consider whether H.B. 1456's heartbeat testing requirement is severable from its abortion restriction because the State has not argued for severability. See Mont.-Dakotas Utils. Co. v. Johaneson, 153 N.W.2d 414, 424 (N.D. 1967) (discussing severability under North Dakota law). We note that H.B. 1456 does not require the physician to inform the pregnant woman whether her unborn child possesses a detectable heartbeat. See Edwards v. Beck, 8 F. Supp. 3d 1091, 1098 (E.D. Ark. 2014) (finding that Arkansas's heartbeat testing requirement was severable from its abortion restriction where the law in question required the physician to inform the pregnant woman that her unborn child possessed a detectable heartbeat and of the statistical probability of bringing the unborn child to term).