# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-2690

_____

Little Rock Family Planning Services, et al.

*Plaintiffs - Appellees*

v.

Leslie Rutledge, in her official capacity as Attorney General of the State of
Arkansas, et al.

*Defendants - Appellants*

------------------------------

Justin Buckley Dyer, Ph. D.; State of Missouri; State of Alabama; State of Alaska;
State of Georgia; State of Idaho; State of Indiana; Commonwealth of Kentucky;
State of Louisiana; State of Nebraska; State of Ohio; State of Oklahoma; State of
South Carolina; State of South Dakota; State of Tennessee; State of Texas; State
of Utah; State of West Virginia

*Amici on Behalf of Appellants*

Society for Maternal- Fetal Medicine; American College of Obstetricians and
Gynecologists; Constitutional Law Scholars; State of California; State of
Colorado; State of Connecticut; State of Delaware; State of Hawaii; State of
Illinois; State of Maine; State of Maryland; State of Massachusetts; State of
Minnesota; State of Nevada; State of New Mexico; State of New York; State of
Oregon; State of Pennsylvania; State of Rhode Island; State of Vermont; State of
Virginia; State of Washington; District of Columbia; Reproductive Justice Organizations

*Amici on Behalf of Appellees*

_____

LOKEN, Circuit Judge.

Little Rock Family Planning Services and Dr. Thomas Tvedten (collectively, "LRFP") brought this 42 U.S.C. § 1983 action challenging the constitutionality of three Arkansas statutes enacted in 2019 that relate to abortions: (1) Act 493, codified at Ark. Code Ann. § 20-16-2004, bans providers from performing an abortion when the "probable age" of the fetus is "determined to be greater than eighteen weeks' gestation," with exceptions for a "medical emergency" or a pregnancy that results from rape or incest. (2) Act 619, codified at Ark. Code Ann. § 20-16-2103, prohibits a provider from intentionally performing an abortion with knowledge that the pregnant woman is seeking the abortion "solely on the basis" of a test indicating Down syndrome or any other reason to believe that the fetus has Down syndrome, with exceptions if the abortion is necessary to save the woman's life or to preserve her health or if the pregnancy is the result of rape or incest. (3) Act 700, codified at Ark. Code Ann. § 20-16-606, provides that a person who performs an abortion must be a licensed physician "board-certified or board-eligible in obstetrics and gynecology" (OBGYN). A provider who violates these statutes commits a Class D felony and is subject to suspension or revocation of his or her medical licence. Defendants are the Attorney General of Arkansas and numerous other officials acting in their official capacities.

Following an evidentiary hearing at which eight witnesses testified, the district court issued a 186-page Preliminary Injunction order preliminarily enjoining Defendants "from enforcing Act 493 of 2019, Act 619 of 2019, and Act 700 of 2019." The court applied our traditional four-part test for the grant of preliminary injunctions in Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc), as modified when the moving party seeks to enjoin a state statute by Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 725, 732 (8th Cir. 2008) (en banc). Defendants appeal.[1] With the appeal pending, LRFP moved to dismiss as moot Defendants' appeal of the injunction against enforcing Act 700, explaining that Plaintiffs now comply with the statute's OBGYN requirement. After careful, de novo review, we affirm the order preliminarily enjoining enforcement of Act 493 and Act 619. We dismiss as moot the appeal of that part of the order that preliminarily enjoined enforcement of Act 700 (the OBGYN requirement) and remand with instructions to vacate that part of the Preliminary Injunction order and its supporting findings and conclusions.

---

[1]Defendants' Notice of Appeal also included an order of the district court judge to whom this case was initially assigned consolidating the case with Planned Parenthood of Ark. & E. Okla. v. Jegley, Case No. 4:15-cv-00784-KGB, then pending before the judge who issued the Preliminary Injunction order. Defendants did not include this order in their statement of the issues presented for review or the argument sections of their brief, as Fed. R. App. P. 28(a)(5) and (8) require. Therefore, we do not consider this issue, and we deny LRFP's time-wasting motion to dismiss that part of the appeal. We also reject as totally without merit Defendants' disrespectful argument that we direct the case be reassigned because the judge who issued the Preliminary Injunction order "has a long history of unlawfully enjoining Arkansas laws." In these motion wars, counsel of record for both sides lost sight of their duties to serve as officers of the court as well as vigorous advocates for their clients.

## I. Acts 493 and 619, The Pre-Viability Abortion Bans.

As the district court recognized, the law governing the constitutionality of two of the three statutes at issue -- Act 493 and Act 619 -- though obviously subject to change in the future, is well established in this Circuit today:

> Before viability, a State "may not prohibit any woman from making the ultimate decision to terminate her pregnancy." It also may not impose upon the right an undue burden, which exists if a regulation's "purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." On the other hand, "[r]egulations which do no more than create a structural mechanism by which the State, or the parent or guardian of a minor, may express profound respect for the life of the unborn are permitted, if they are not a substantial obstacle to the woman's exercise of the right to choose."

MKB Mgmt. Corp. v. Stenehjem, 795 F.3d 768, 772 (8th Cir. 2015), cert. denied, 136 S. Ct. 981 (2016), quoting Gonzales v. Carhart, 550 U.S. 124, 146 (2007), in turn quoting Planned Parenthood of S.E. Pa. v. Casey, 505 U.S. 833, 879, 878, and 877 (1992). The Supreme Court has defined viability as "the time at which there is a realistic possibility of maintaining and nourishing a life outside the womb, so that the independent existence of the second life can in reason and all fairness be the object of state protection that now overrides the rights of the woman." Casey, 505 U.S. at 870. "Before viability," the Court declared, "the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure." Id. at 846. "The woman's right to terminate her pregnancy before viability . . . . is a rule of law and a component of liberty we cannot renounce." Id. at 871 (citation omitted).

The Supreme Court has repeatedly stated that its pre-viability rule is categorical: "Regardless of whether exceptions are made for particular circumstances, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability." Casey, 505 U.S. at 879; see Gonzales, 550 U.S. at 146; cf. June Med. Servs. L.L.C., v. Russo, 140 S. Ct. 2103, 2135 (2020) (Roberts, C.J., concurring).[2] We have applied the rule categorically, even while recognizing "that viability varies among pregnancies and that improvements in medical technology will both push later in pregnancy the point at which abortion is safer than childbirth and advance earlier in gestation the point of fetal viability." Edwards v. Beck, 786 F.3d 1113, 1117 (8th Cir. 2015) (citations omitted) (invalidating an Arkansas statute banning abortions after twelve weeks' gestation because the Act "prohibits women from making the ultimate decision to terminate a pregnancy at a point before viability").

**A. Act 493, The 18-Week Ban.** Act 493 provides that a person "shall not intentionally or knowingly perform, induce, or attempt to perform or induce an abortion of an unborn human being if the probable gestation age of the unborn human being is determined to be greater than eighteen (18) weeks' gestation." Ark. Code Ann. § 20-16-2004(b). The district court preliminarily enjoined enforcement of this statute based on uncontroverted medical testimony that "no fetus is viable at 18 weeks," and that "[i]t is commonly accepted in the field of OBGYN that a normally developing fetus will not attain viability until at least 24 weeks." This testimony has strong support in governing case law. See MKB Mgmt., 795 F.3d at 774 ("[t]oday, viability generally occurs at 24 weeks"); accord Casey, 505 U.S. at 860.

---

[2]Chief Justice Roberts's concurring opinion is controlling. Hopkins v. Jegley, 968 F.3d 912, 915 (8th Cir. 2020), citing Marks v. United States, 430 U.S. 188, 193 (1977), and Gregg v. Georgia, 428 U.S. 158, 169 n.15 (1976).

On appeal, Defendants do not contest the district court's conclusion that LRFP is likely to succeed on the merits of its claim that Act 493 prohibits LRFP and other providers from performing pre-viability abortions. Rather, they argue that Arkansas may ban abortions eighteen weeks after gestation because the statute "responds to evidence linking increased maternal risk to increased gestational age" and "recognizes" that, by eighteen weeks, "an unborn child has taken on the human form in all relevant respects." But this argument simply brushes aside the governing legal principle: "[b]efore viability the State's interests are not strong enough to support a prohibition of abortion." Casey, 505 U.S. at 846. As Defendants presented no generally accepted medical evidence that the attainment of viability has shifted to before eighteen weeks after gestation, we must affirm the district court's order preliminarily enjoining enforcement of Act 493, which effectively prohibits a substantial universe of pre-viability abortions.

**B. Act 619, The Down Syndrome Ban.** Act 619 prohibits a physician from performing or attempting to perform an abortion "with the knowledge that a pregnant woman is seeking an abortion solely on the basis of: (1) A test result indicating Down syndrome in an unborn child; (2) A prenatal diagnosis of Down syndrome in an unborn child; or (3) Any other reason to believe that an unborn child has Down syndrome." Ark. Code Ann. § 20-16-2103(a). Based on undisputed evidence that "post-viability abortions are not performed in Arkansas currently," the district court concluded that Act 619 "unconstitutionally restricts pre-viability abortions" and preliminarily enjoined Defendants from "enforcing . . . Act 619."[3]

---

[3]The court's Preliminary Injunction order stated that, because there is no evidence post-viability abortions are performed in Arkansas, "the court will not examine whether Act 619 is constitutional as applied to post-viability abortions at this stage of the proceedings." At oral argument, LRFP confirmed that Plaintiffs do not perform post-viability abortions and do not challenge Act 619 in that regard. Both counsel agreed that the preliminary injunction does not affect Act 619 as it may apply to post-viability abortions, so we need not address that issue.

On appeal, Defendants argue we should reverse the preliminary injunction because the district court erroneously declared a "novel, absolute right to pre-viability abortion." According to Defendants, in both Casey and Gonzales the Supreme Court upheld pre-viability abortion bans -- in Casey, the Court upheld a Pennsylvania parental-consent requirement that "entirely barred" minors from electing pre-viability abortions unless they obtained a "judicial bypass," and in Gonzales, the Court upheld bans on "certain kinds" of pre-viability abortions. Defendants argue that Act 619 is constitutional because it furthers the State's valid interest in preventing discrimination on the basis of Down syndrome. They assert that this issue is not controlled by Casey, citing Box v. Planned Parenthood of Ind. & Ky., Inc., 139 S. Ct. 1780, 1792 (2019) (Thomas, J., concurring in the denial of a writ of certiorari to consider the issue) ("Whatever else might be said about Casey, it did not decide whether the Constitution requires States to allow eugenic abortions.").

Defendants misconstrue Casey and Gonzales. These decisions did not uphold complete bans on pre-viability abortions. In Casey, the Court upheld the parental consent regulation at issue *because* the judicial bypass procedure ensured that minors were not completely banned from obtaining pre-viability abortions. 505 U.S. at 899. In Gonzales the Court upheld a law banning physicians from performing a particularly brutal *method* of abortion; the Court noted the statute "still allows, among other means, a commonly used and generally accepted method [to perform abortion], so it does not construct a substantial obstacle to the abortion right." 550 U.S. at 165 (2007). The Court expressly stated that it "assume[d] the following principles for the purposes of this opinion. Before viability, a State 'may not prohibit any woman from making the ultimate decision to terminate her pregnancy.'" Id. at 146, quoting Casey, 505 U.S. at 879. A majority of the Supreme Court recently reaffirmed these principles:

> Both [parties] agree that the undue burden standard announced in *Casey* provides the appropriate framework to analyze Louisiana's law.

*Casey* reaffirmed the most central principle of *Roe v. Wade*, a woman's right to terminate her pregnancy before viability. At the same time, it recognized that the State has important and legitimate interests in protecting . . . the potentiality of human life. . . . To serve the latter interest, the State may, among other things, enact rules and regulations designed to encourage her to know that there are philosophic and social arguments of great weight that can be brought to bear in favor of continuing the pregnancy to full term.

\* \* \* \* \*

*Casey* discussed [the] benefits [of a particular regulation] in considering the threshold requirement that the State have a "legitimate purpose" and that the law be "reasonably related to that goal." So long as that showing is made, the only question for a court is whether a law has the "effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus."

\* \* \* \* \*

Here the plurality expressly acknowledges that we are not considering how to analyze an abortion regulation that does not present a substantial obstacle. . . . In this case, *Casey*'s requirement of finding a substantial obstacle before invalidating an abortion regulation is therefore a sufficient basis for the decision . . . . I would adhere to the holding of *Casey*, requiring a substantial obstacle before striking down an abortion regulation.

June Med. Servs., 140 S. Ct. at 2135, 2138-39 (2020) (Roberts, C.J., concurring) (cleaned up).

In this case, it is undisputed that Act 619 is a substantial obstacle; indeed, it is a complete prohibition of abortions based on the pregnant woman's reason for exercising the right to terminate her pregnancy before viability. We agree with our sister circuits that it is "inconsistent to hold that a woman's right of privacy to

-8-

terminate a pregnancy exists if . . . the State can eliminate this privacy right if [she] wants to terminate her pregnancy for a particular purpose." Planned Parenthood of Ind. & Ky., Inc. v. Comm'r, Ind. State Dep't of Health, 888 F.3d 300, 307 (7th Cir. 2018), rev'd in part on other grounds sub nom., Box v. Planned Parenthood of Ind. & Ky., Inc., 139 S. Ct. 1780 (2019); accord Jackson Women's Health Org. v. Dobbs, 945 F.3d 265, 274 (5th Cir. 2019). Though the Supreme Court may of course decide to revisit how Casey should apply to purpose-based bans on pre-viability abortions, the district court did not abuse its discretion by preliminarily enjoining enforcement of Act 619 under current governing law. That portion of the preliminary injunction is affirmed.

## II. Act 700, The OBGYN Requirement.

Act 700 provides that abortions in Arkansas must be performed by a licensed physician who is a board-certified or board-eligible OBGYN. Ark. Code Ann. § 20-16-606(a). After Defendants appealed the district court's order preliminarily enjoining enforcement of Act 700, all plaintiffs moved to dismiss this part of the appeal as moot because LRFP has hired a board-certified OBGYN to provide abortion care at LRFP, making the injunction unnecessary at this time. Plaintiff Tvedten, who has provided abortion services at LPRF for many years and is not OBGYN-certified, joined in the motion to dismiss. Defendants argue the appeal is not moot because "Plaintiffs will seek yet another preliminary injunction from the district court as soon as they decide again that litigation would be more fruitful than compliance." LRFP replies that, if it does seek injunctive relief in the future, "their entitlement to relief will depend on the facts presented at that time."[4]

---

[4]The recognized exception to mootness for issues "capable of repetition, yet evading review," does not apply to moot appeals of preliminary injunctions. Bierman v. Dayton, 817 F.3d 1070, 1074 (8th Cir. 2016) (citation omitted).

We have jurisdiction of an appeal from an interlocutory order granting a preliminary injunction. 28 U.S.C. § 1292(a)(1). The "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." University of Texas v. Camenisch, 451 U.S. 390, 395 (1981). The mootness doctrine "has its origins in the article III case or controversy requirement" and also serves "as a check against the unnecessary use of judicial resources . . . and against the creation of unnecessary precedent." Olin Water Servs. v. Midland Research Laboratories, Inc., 774 F.2d 303, 305 & n.2 (8th Cir. 1985) (citations omitted). "Mootness occurs when the parties 'lack a legally cognizable interest in the outcome.'" Id. If a judgment or interlocutory order becomes moot while awaiting appellate review, the appellate court "may not consider its merits, but may make such disposition of the whole case as justice may require." U.S. Bancorp Mtg. Co. v. Bonner Mall P'ship, 513 U.S. 18, 21 (1994).

Here, the preliminary injunction preserved the status quo by allowing LRFP to continue providing abortion services by doctors who are not OBGYN-certified. Having been granted this preliminary relief, LRFP argues Defendants' appeal is moot because LRFP is now complying with Act 700 and therefore Plaintiffs are not adversely affected by the statute. Though the premise is certainly open to question,[5] we agree that this part of the controversy is now moot. "Plaintiffs are masters of their complaints and remain so at the appellate stage of a litigation," and their argument "amounts to a decision to no longer seek" a preliminary injunction. Webster v. Reproductive Health Servs., 492 U.S. 490, 512 (1989). Defendants cite no practical reason why there is an actual controversy *at this time*. Defendants argue that LRFP

---

[5]When the motion to dismiss this part of the appeal as moot was filed, Dr. Tvedten's license to practice medicine had been temporarily suspended due to a complaint unrelated to abortion services. We are advised that the suspension was recently lifted, which presumably means that, if the preliminary injunction is vacated, Act 700 will again preclude him from providing abortion services. However, it is undisputed that Dr. Tvedten joined LRFP's motion to dismiss.

may seek future preliminary injunctive relief if its OBGYN-certified providers go elsewhere. But a "conjectural or hypothetical" possibility of future harm is insufficient to satisfy the case-or-controversy requirement for seeking injunctive relief. Brazil v. Ark. Dep't of Human Servs., 892 F.3d 957, 960 (8th Cir. 2018) (citation omitted). In these circumstances, their opposition to dismissal simply urges an unnecessary use of judicial resources and the creation of unnecessary precedent.

The more important question, which invariably arises when the party that prevailed in the district court takes voluntary action that moots an appeal, is whether to remand with directions to vacate the mooted order. See generally Perficient, Inc. v. Munley, 973 F.3d 914 (8th Cir. 2020). The Supreme Court has instructed us to "dispose[] of moot cases in the manner most consonant to justice in view of the nature and character of the conditions which have caused the case to become moot." U.S. Bancorp, 513 U.S. at 24 (cleaned up). Applying that general principle, the Court declared that the "equitable tradition of vacatur" should normally be invoked when a party "seeks review of the merits of an adverse ruling, but is frustrated [when] mootness results from unilateral action of the party who prevailed below." Id. at 25.

We conclude that vacatur is the appropriate disposition in this case for many reasons. First, the timing of LRFP's actions strongly suggest an intent to avoid appellate review. Second, the merits of LRFP's challenge to Act 700 remain to be decided in the district court, and it would be inappropriate to have those unresolved issues affected by the district court's findings and conclusions in a preliminary injunction order LRFP's actions prevented us from reviewing. See Perficient, 973 F.3d at 917. Third, and perhaps most important, in preliminarily enjoining Act 700, the district court employed the undue burden analysis based upon Whole Woman's Health v. Hellerstedt, 136 S. Ct. 2292 (2016), that it used in Hopkins, which we recently reversed and remanded for further consideration in light of June Medical Services. 968 F.3d at 915-16. As LRFP's voluntary action has caused the preliminary injunction of Act 700 to become moot, we accomplish the same result in

-11-

this case by remanding to the district court with directions to vacate as moot the part of its order preliminarily enjoining Act 700 together with the findings of fact and conclusions of law supporting that equitable relief.

### III. Conclusion.

For the forgoing reasons, we affirm the district court's order preliminarily enjoining enforcement of Act 493 and Act 619. We dismiss as moot the appeal of the preliminary injunction of Act 700 and remand to the district court with instructions to vacate this part of its Preliminary Injunction order. We dismiss Defendants' appeal from the district court's consolidation orders and deny their request that the case be reassigned on remand. We deny as frivolous LRFP's motion to exclude from the record on appeal the files from Planned Parenthood of Ark. & E. Okla. v. Jegley that Defendants included in their Designation of Record. See fn.1 supra. The parties will each bear their own costs of appeal. There is no "prevailing party" for purposes of 42 U.S.C. § 1988(b).

SHEPHERD, Circuit Judge, with whom ERICKSON, Circuit Judge, joins, concurring.

Because the Court's opinion applies binding Supreme Court precedent, I join it in full. I write separately, however, to reiterate my view that "good reasons exist for the [Supreme] Court to reevaluate its jurisprudence" regarding the viability standard as announced in Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833 (1992). See MKB Mgmt. Corp. v. Stenehjem, 795 F.3d 768, 773 (8th Cir. 2015).

In MKB Management Corp., this Court discussed at length the reasons that the viability standard has proven unsatisfactory, including that it "gives too little consideration to the 'substantial state interest in potential life throughout pregnancy'"

-12-

by tying the interests to scientific advancements in obstetrics and "not to developments in the unborn"; that it deprives state legislatures of the opportunities to determine the appropriate interest in protecting unborn children by substituting the Supreme Court's "own preference to that of the legislature"; and that the factual underpinnings of Roe v. Wade, 410 U.S. 113 (1973), and Casey may have changed. Id. at 774-75 (citations omitted). I continue to believe that these reasons warrant reconsideration of the viability standard. But this case presents yet another reason why the viability standard is unsatisfactory and worthy of reconsideration. Act 619, which prohibits a physician from performing or attempting to perform an abortion based on a diagnosis or suspicion of Down Syndrome involves significant and, as yet, unconsidered issues regarding the balance of interests when the sole reason a woman seeks an abortion is what she deems an unwanted immutable characteristic of the unborn child. And Casey directs that we resolve this inquiry by considering viability alone.

In Box v. Planned Parenthood of Indiana & Kentucky, Inc., 139 S. Ct. 1780, 1782 (2019) (per curiam), the Supreme Court granted certiorari and reversed the judgment of the Seventh Circuit regarding an Indiana statute governing the disposition of fetal remains, but declined to grant certiorari to a second question, regarding another Indiana statue prohibiting abortion providers from providing abortions sought on the basis of the sex, race, or disability of the unborn child. In a separate concurring opinion, Justice Thomas expressed his view that the latter law "and other laws like it promote a State's compelling interest in preventing abortion from becoming a tool of modern-day eugenics," and acknowledged that "with today's prenatal screening tests and other technologies, abortion can easily be used to eliminate children with unwanted characteristics." Id. at 1783, 1790 (Thomas, J., concurring). Justice Thomas agreed, however, with the Court's decision to decline to grant certiorari because "further percolation may assist our review of this issue of first impression." Id. at 1784. But in closing, Justice Thomas noted that "[a]lthough the Court declines to wade into these issues today, we cannot avoid them forever.

-13-

Having created the constitutional right to an abortion, this Court is dutybound to address its scope." Id. at 1793.

Others have taken note of the fact that "Casey did not consider the validity of an anti-eugenics laws." Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health, 917 F.3d 532, 536 (7th Cir. 2018) (Easterbrook, J., dissenting). In the Seventh Circuit proceedings prior to Box, Judge Easterbrook noted in dissent that

> Casey and other decisions hold that, until a fetus is viable, a woman is entitled to decide whether to bear a child. But there is a difference between "I don't want a child" and "I want a child, but only a male" or "I want only children whose genes predict success in life." Using abortion to promote eugenic goals is morally and prudentially debatable on grounds different from those that underlay the statutes Casey considered.

Id. Today's opinion is another stark reminder that the viability standard fails to adequately consider the substantial interest of the state in protecting the lives of unborn children as well as the state's "compelling interest in preventing abortion from becoming a tool of modern-day eugenics." Box, 139 S. Ct. at 1783 (Thomas, J., concurring). The viability standard does not and cannot contemplate abortions based on an unwanted immutable characteristic of the unborn child. However, because we must apply the ill-fitting and unworkable viability standard to an act aimed at preventing eugenics-based abortions unless and until the Supreme Court dictates otherwise, I concur in the Court's opinion holding Act 619 unconstitutional.

ERICKSON, Circuit Judge, with whom SHEPHERD, Circuit Judge, joins, concurring.

I concur in the Court's opinion and in Judge Shepherd's concurrence, but write separately to emphasize my belief that there are important reasons for the Supreme Court to revisit its precedent in Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833 (1992). Viability as a standard is overly simplistic and overlooks harms that go beyond the state's interest in a nascent life alone.

The great glory of humanity is its diversity. We are, as a species, remarkably variant in our talents, abilities, appearances, strengths, and weaknesses. The human person has immense creative powers, a range of emotional responses that astound the observant, and a capacity to love and be loved that is at the core of human existence. Each human being possesses a spirit of life that at our finest we have all recognized is the essence of humanity. And each human being is priceless beyond measure. Children with Down syndrome share in each of these fundamental attributes of humanity.

While the state's interest in nascent life has been recognized to give way to the right of a woman to be free from "unduly burdensome interference with her freedom to decide whether to terminate her pregnancy" id. at 874 (quoting Maher v. Roe, 432 U.S. 464, 473–74(1977)), it is apparent that the right is not, and should not be, absolute. By focusing on viability alone, the Court fails to consider circumstances that strike at the core of humanity and pose such a significant threat that the State of Arkansas might rightfully place that threat above the right of a woman to choose to terminate a pregnancy.

As Judge Easterbrook recognized in his dissent in Planned Parenthood of Indiana & Kentucky, Inc. v. Comm'r of Indiana State Dep't of Health, 917 F.3d 532, 536 (7th Cir. 2018) (Easterbrook, J., dissenting), eugenics pose a question that is

different in both degree and kind from the interest of the state in nascent life. One of the great curses of the 20th century was the rise of the eugenics movement. It gave a patina of acceptability to such horrors as genocide, forced sterilization, the development of a master race, and the death of millions of innocents.

The new eugenics movement is more subtle, but a state could nonetheless conclude that it poses a great and grave risk to its citizens. A core value of eugenics is the notion that diversity in the human population should be reduced to maximize and eventually realize the "ideal" of a more "perfect person." Inherent in this concept is the goal of controlling genetic diversity of a population in order to create a super race: one that is deemed to be healthier, smarter, stronger, and more beautiful. The creation of such a cadre of people would undoubtedly lead to greater discrimination against people who are deemed to be "inferior," resulting in a broad attack on diversity of the human population.

Recent history demonstrates biases broadly prevalent in the society related to race, gender, sexual orientation, and medical or intellectual infirmities that could in the not-too-distant future be the subject of genetic manipulation, either in the laboratory or by termination of pregnancies. The State of Arkansas could decide that the risk posed by such practices presents a greater risk to humanity than a burden placed on a woman's right to choose to terminate her pregnancy–but such a decision is foreclosed by our current precedent based on viability alone. The State of Arkansas could decide that addressing social inequalities and disparities is a far more appropriate response to marginalized populations than embracing the neo-eugenics movement.

In Western society, there is currently no more threatened population than children with Down syndrome. While there are still 6,000 children born annually in the United States with Down syndrome, the same is not the case in other western democracies. Centers for Disease Control & Prevention, Data & Statistics on Down

-16-

Syndrome, https://www.cdc.gov/ncbddd/birthdefects/downsyndrome/data.html (last accessed on December 29, 2020). For example, since Denmark adopted universal prenatal screening for Down syndrome, the number of parents who chose to continue a pregnancy after a diagnosis of Down syndrome has ranged from 0–13. Last year in 2019, only seven pregnancies proceeded to term after diagnosis of Down syndrome and another 11 infants undiagnosed by the testing were born. That is a total of 18 infants with Down syndrome being born in all of Denmark. The State of Arkansas could decide that this kind of eugenics is dangerous and poses a threat to its citizens.

I deeply regret that precedent forecloses a balancing of the state's actual interest against the woman's right to choose in enacting Act 619.

_____