# United States Court of Appeals
### For the Eighth Circuit

_____

Nos. 19-2882, 19-3134

_____

Reproductive Health Services of Planned Parenthood of the St. Louis Region, Inc., et al

*Plaintiffs - Appellees*

v.

Governor Michael L. Parson, et al

*Defendants - Appellants*

_____

Appeal from United States District Court
for the Western District of Missouri

_____

Submitted: September 24, 2020
Filed: June 9, 2021

_____

Before KELLY, WOLLMAN, and STRAS, Circuit Judges.

_____

KELLY, Circuit Judge.

Missouri Governor Michael L. Parson and various other state officials (collectively, Missouri) appeal the district court's[1] grant of a preliminary injunction

_____

[1]The Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri.

enjoining the enforcement of several abortion-related provisions of Missouri House Bill 126 (HB 126). We affirm.

## I.

Reproductive Health Services of Planned Parenthood of the St. Louis Region and its Chief Medical Officer Dr. Colleen P. McNicholas (together, RHS) provide reproductive healthcare—including pre-viability abortions—in St. Louis, Missouri. On July 30, 2019, RHS filed suit on behalf of themselves, as well as their patients, physicians, and staff, challenging the constitutionality of several provisions of HB 126. At issue here are the "Gestational Age Provisions," Mo. Rev. Stat. §§ 188.056-.058, .375, and the "Down Syndrome Provision," id. § 188.038, all of which were scheduled to go into effect on August 28, 2019.

The first Gestational Age Provision provides, in relevant part, that "no abortion shall be performed or induced upon a woman at eight weeks gestational age or later, except in cases of medical emergency." Id. § 188.056.1. Sections 188.057, 188.058, and 188.375 are nearly identical to this first provision, except that they apply to abortions performed at or after 14, 18, and 20 weeks gestational age, respectively. See id. §§ 188.057-.058, .375. A provider who violates any of the Gestational Age Provisions faces criminal prosecution and professional discipline. Id. §§ 188.056-.058, .375.

The Down Syndrome Provision prohibits abortions if the provider "knows that the woman is seeking the abortion solely because of a prenatal diagnosis, test, or screening indicating Down [s]yndrome or the potential of Down [s]yndrome in an unborn child." Id. § 188.038.2.[2] A provider who violates the Down Syndrome

---

[2]A different section of HB 126 requires "the physician who performed or induced the abortion" to complete "[a]n individual report for each abortion performed

Provision is subject to a number of civil penalties, including professional discipline. Id. § 188.038.4.

RHS filed a motion for preliminary injunction, asserting that these provisions would effectively prohibit RHS from providing pre-viability abortion care in Missouri. The district court determined that both the Gestational Age Provisions and the Down Syndrome Provision banned—rather than merely regulated—pre-viability abortions and found that RHS was "highly likely" to succeed on the merits as to all these provisions.

The district court then found that the balance of equities favored a preliminary injunction as to the Gestational Age Provisions, but not the Down Syndrome Provision. The court explained that, in contrast to the Gestational Age Provisions, the record did not show that enforcement of the Down Syndrome Provision would actually harm anyone in the months leading up to final judgment. Missouri appealed.[3] In the meantime, RHS filed a motion for reconsideration (or in the alternative, a renewed motion for preliminary injunction) of the district court's denial of injunctive

---

or induced upon a woman," which "shall include . . . a certification that the physician does not have any knowledge that the woman sought the abortion solely because of a prenatal diagnosis, test, or screening indicating Down [s]yndrome or the potential of Down [s]yndrome in the unborn child . . . ." Id. § 188.052.1.

[3]Missouri also sought a partial stay of the district court's order—insofar as the order temporarily protects abortions performed at 20 weeks gestational age or later—pending appeal. The district court denied Missouri's request. Finding that the requested partial stay would effectively bar about two abortions per week pending litigation, the district court determined that it would "gravely affect[] the lives and family situation of a few pregnant women, who would be choosing abortions during the last available week or two before viability." Reprod. Health Servs. of Planned Parenthood of St. Louis Region, Inc. v. Parson, 2019 WL 4467658, at *2 (W.D. Mo. Sept. 18, 2019). The district court's order denying Missouri a partial stay is not on appeal here.

-3-

relief as to the Down Syndrome Provision. In support, RHS submitted additional evidence—namely, a supplemental declaration from Dr. McNicholas discussing, in part, three patients she treated in the preceding 12 months who sought abortions after receiving a fetal diagnosis of Down syndrome.

The district court granted RHS's motion for reconsideration and modified its preliminary injunction to include the Down Syndrome Provision. Both orders granting preliminary injunctive relief are now before this court. See Reprod. Health Servs. of Planned Parenthood of St. Louis Region, Inc. v. Parson (RHS I), 389 F. Supp. 3d 631 (W.D. Mo. 2019); Reprod. Health Servs. of Planned Parenthood of St. Louis Region, Inc. v. Parson (RHS II), 408 F. Supp. 3d 1049 (W.D. Mo. 2019).

## II.

### A.

As a preliminary matter, Missouri argues that RHS lacks both individual and third-party standing. To establish standing under Article III of the U.S. Constitution, a plaintiff must show "(1) injury in fact, (2) a causal connection between that injury and the challenged conduct, and (3) the likelihood that a favorable decision by the court will redress the alleged injury." Young Am. Corp. v. Affiliated Comput. Servs. (ACS), Inc., 424 F.3d 840, 843 (8th Cir. 2005) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992)). But as RHS points out, "[e]ven in cases in which the plaintiff sues to enforce another person's rights, the injury-in-fact requirement turns on *the plaintiff*'s personal stake in the controversy." This is because Article III requires plaintiffs to have a "sufficiently concrete interest in the outcome of [the] suit to make it a case or controversy." Sec'y of State of Md. v. Joseph H. Munson Co., 467 U.S. 947, 955 n.5 (1984) (alteration in original) (quoting Singleton v. Wulff, 428 U.S. 106, 112 (1976)). Generally, physicians have Article III standing to challenge

abortion laws that subject them to governmental sanctions. See, e.g., Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 903-04 (1992) (plurality opinion); Doe v. Bolton, 410 U.S. 179, 188 (1973).

Here, the Gestational Age Provisions and the Down Syndrome Provision directly target physician conduct. Because these provisions put physicians at risk of civil and criminal sanctions, RHS has the requisite personal stake to establish individual standing under Article III. Moreover, RHS also has standing to sue on behalf of its patients. See June Med. Servs. L.L.C. v. Russo, 140 S. Ct. 2103, 2118-19 (2020) (plurality opinion). The Supreme Court has "generally permitted plaintiffs to assert third-party rights in cases where the enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights." Id. (cleaned up). This is in part because the "'threatened imposition of governmental sanctions' for noncompliance . . . assures us that the plaintiffs have every incentive to 'resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function.'" Id. at 2119 (quoting Craig v. Boren, 429 U.S. 190, 195 (1976)); see also Singleton, 428 U.S. at 117 (explaining that abortion providers can also show third-party standing based on the "closeness of [their] relationship" with their patients, as well as on the risk of "imminent mootness" that might pose an obstacle to pregnant patients bringing their own claims). Indeed, the Supreme Court has recently reminded us that it has "long permitted abortion providers to invoke the rights of their actual or potential patients in challenges to abortion-related regulations." June Med. Servs., 140 S. Ct. at 2118 (plurality opinion); see Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action, 558 F.2d 861, 865 n.3 (8th Cir. 1977).[4] RHS has standing, and we proceed to the merits.

_____

[4]Missouri's argument that RHS may not file a § 1983 action is premised on its position that RHS merely asserts the rights of third parties. Given our ruling on standing, this argument also fails. See Ayotte v. Planned Parenthood of N. New England, 546 U.S. 320, 324-31 (2006) (evaluating preliminary injunction of an abortion statute on the merits in lawsuit filed under 42 U.S.C. § 1983); Pediatric

-5-

## III.

In deciding whether to issue a preliminary injunction, a district court considers "(1) the threat of irreparable harm to the moving party, (2) the balance between this harm and the injury that granting the injunction will inflict on the non-moving party, (3) the probability that the moving party will succeed on the merits, and (4) the public interest." Planned Parenthood of Ark. & E. Okla. v. Jegley, 864 F.3d 953, 957 (8th Cir. 2017) (citing Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). Here, the district court properly required RHS to "make a more rigorous showing that it is likely to prevail on the merits," a standard required "[w]here a preliminary injunction is sought to enjoin the implementation of a duly enacted state statute." Id. at 957-58 (cleaned up).

We review the district court's "ultimate decision to grant an injunction . . . for abuse of discretion, with factual findings examined for clear error and legal conclusions considered *de novo*." Brakebill v. Jaeger, 932 F.3d 671, 676 (8th Cir. 2019). An abuse of discretion occurs "when the district court relies on clearly erroneous factual findings or an error of law." Dixon v. City of St. Louis, 950 F.3d 1052, 1055 (8th Cir. 2020). "An abuse of discretion also occurs when a relevant factor that should have been given significant weight is not considered; when an irrelevant or improper factor is considered and given significant weight; and when all

---

Specialty Care, Inc. v. Ark. Dep't of Hum. Servs., 293 F.3d 472, 478 (8th Cir. 2002) (affirming district court's holding that the physician plaintiffs "properly asserted a federal right enforceable in a § 1983 action," including on behalf of their patients); Planned Parenthood of Wis., Inc. v. Van Hollen, 738 F.3d 786, 794-95 (7th Cir. 2013) (affirming availability of third-party standing based on the unquestionable "justiciability" of precedent cases "filed pursuant to section 1983" and "in which doctors and abortion clinics were found to have had standing").

proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment." Id. (cleaned up).

## A.

In Casey, the Supreme Court reaffirmed the right "to choose to have an abortion before viability and to obtain it without undue interference from the State." 505 U.S. at 846. "Before viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure." Id. Missouri does not dispute that fetuses are considered nonviable at or before 20 weeks gestational age. Thus, the Gestational Age Provisions prohibiting abortions performed at or after 8, 14, 18, and 20 weeks gestational age[5] apply to pre-viability abortions.

Nevertheless, Missouri argues that the Gestational Age Provisions do not ban pre-viability abortions, but merely regulate them. This distinction is significant. Bans on pre-viability abortions are categorically unconstitutional. See id. at 879; Little Rock Fam. Plan. Servs. v. Rutledge, 984 F.3d 682, 687 (8th Cir. 2021). A restriction, on the other hand, is permissible so long as it does not impose "a substantial obstacle" to the right to an abortion. See Casey, 505 U.S. at 877. According to Missouri, because the Provisions still permit pre-viability abortions before 8 weeks gestational age, they do not constitute categorical bans.

We have already rejected a similar argument in a nearly identical statute. In Edwards v. Beck, the Arkansas statute at issue prohibited doctors from performing abortions at 12 weeks' gestation (or later) where the fetus has a detectable heartbeat.

_____

[5]This is measured as 8, 14, 18, and 20 weeks from the first day of a patient's last menstrual cycle.

-7-

786 F.3d 1113, 1115-16 (8th Cir. 2015) (per curiam), cert. denied, 577 U.S. 1102 (2016). It was undisputed that "a fetus is generally not viable under 24 weeks' gestation, is never viable at 12 weeks, and, in all normally-progressing pregnancies, has a detectable heartbeat by 12 weeks." Id. at 1116. Like Missouri does now, the State of Arkansas "trie[d] to frame the law as a regulation, not a ban, on pre-viability abortions because they are available during the first 12 weeks (and thereafter if within the exceptions)." Id. at 1117. But because the Arkansas law "prohibit[ed] women from making the ultimate decision to terminate a pregnancy at a point before viability," it constituted a ban, not a regulation. Id.; see also MKB Mgmt. Corp. v. Stenehjem, 795 F.3d 768, 772-73 (8th Cir. 2015) (invalidating a North Dakota fetal-heartbeat restriction for the same reasons articulated in Edwards), cert. denied, 136 S. Ct. 981 (2016).

Relying on Casey, however, Missouri nonetheless contends that the Supreme Court has previously "upheld prohibitions on certain classes of pre-viability abortions." This argument lacks merit. Casey upheld, in part, requirements for informed consent and for a 24-hour waiting period—it did not uphold a ban on all abortions performed at certain points of a pre-viability pregnancy. 505 U.S. at 881-87. Under those requirements, patients could still obtain an abortion at any point before fetal viability so long as they received certain information 24 hours before undergoing the procedure. See id. at 881. Here, by contrast, there is nothing an individual in Missouri could lawfully do to obtain an abortion at or after the applicable gestational age cut-off.[6] See id. at 894-95 (explaining that an abortion statute "must

---

[6]Missouri makes the same argument with respect to Gonzales v. Carhart, 550 U.S. 124 (2007). As in Casey, the statute at issue in Gonzales did not ban pre-viability abortions; rather, it outlawed one of several medical *techniques* used for performing abortions. Gonzales, 550 U.S. at 164-65. The Court concluded that "[t]he Act [was] not invalid on its face where there [was] uncertainty over whether the barred procedure is ever necessary to preserve a woman's health, *given the availability of other abortion procedures that are considered to be safe alternatives*." Id. at 166-67 (emphasis added).

be judged by reference to those for whom it is an actual rather than an irrelevant restriction"). These provisions do not merely have "the incidental effect of making it more difficult or more expensive to procure an abortion" before viability. Gonzales v. Carhart, 550 U.S. 124, 158 (2007) (quoting Casey, 505 U.S. at 874); see also id. at 157-58 (reaffirming Casey's distinction between laws that merely make it more difficult or expensive to get an abortion and those designed to impermissibly "strike at the right itself" (quoting Casey, 505 U.S. at 874)). Instead, the Gestational Age Provisions are bans, and we agree with the district court that RHS is likely to succeed on the merits of this claim.

## B.

Missouri also characterizes the Down Syndrome Provision as a regulation of pre-viability abortions. But a person who wants a pre-viability abortion "solely because of a prenatal diagnosis, test, or screening indicating Down [s]yndrome or the potential of Down [s]yndrome" in the fetus is completely prohibited from getting one. Mo. Rev. Stat. § 188.038.2. Unlike a regulation, the Down Syndrome Provision does not set a condition that—upon compliance—makes the performance of a pre-viability abortion lawful, thus preserving the constitutional right to elect the procedure. Rather, it bans access to an abortion entirely.

Missouri contends that the word "solely" in the statute performs a regulatory function because it permits pre-viability abortions when the Down syndrome diagnosis is only part of the patient's motivation. But it is well-established that "[w]hether or not 'exceptions are made for particular circumstances, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability.'" Edwards, 786 F.3d at 1117 (quoting Casey, 505 U.S. at 879); see also Stenehjem, 795 F.3d at 772 (explaining that regulations are permissible when they "do no more than create a structural mechanism by which the State . . . may

-9-

express profound respect for the life of the unborn" (quoting Gonzales, 550 U.S. at 146)).  Regulations on pre-viability abortions are permissible provided they do not constitute an undue burden, see, e.g., Casey, 505 U.S. at 887-94 (rejecting a spousal notification regulation that posed an undue burden), but bans on pre-viability abortions are not, see Edwards, 786 F.3d at 1117.  Here, the Down Syndrome Provision would prevent certain patients from getting a pre-viability abortion at all.  That is a ban, not a regulation.[7]  We agree that RHS is likely to succeed on the merits of its challenge to the Down Syndrome Provision as well.

## C.

We turn now to the remaining Dataphase factors.  See Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 732 (8th Cir. 2008) (en banc).  "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined."  Dataphase, 640 F.2d at 113.

## 1.

Missouri argues that the threat of irreparable harm from allowing the Gestational Age Provisions to go into effect is minimal because "the vast majority of

---

[7]Missouri insists that the Supreme Court, by rejecting the argument in Roe that a woman has an absolute right "to terminate her pregnancy at whatever time, in whatever way, and for whatever reason she alone chooses," Roe v. Wade, 410 U.S. 113, 153 (1973), left open the possibility that states may ban pre-viability abortions sought for prohibited reasons.  This argument is unavailing if only because it ignores "Roe's central holding," reaffirmed in Casey, "that viability marks the earliest point at which the State's interest in fetal life is constitutionally adequate to justify a legislative ban on nontherapeutic abortions."  505 U.S. at 860.

women already obtain abortions prior to the later benchmarks, and many of the remaining women undoubtedly could do so by seeking abortions earlier in pregnancy." The accuracy of this claim aside, Missouri's focus on the number of women *un*affected by the Gestational Age Provisions is misplaced. The irreparable harm analysis turns on the nature of the injury likely to result from the challenged action, not the number of people who would be injured. See Hinz v. Neuroscience, Inc., 538 F.3d 979, 986 (8th Cir. 2008) (defining an irreparable injury as an injury "of such a nature that money damages alone do not provide adequate relief"); see also Kroupa v. Nielsen, 731 F.3d 813, 820-21 (8th Cir. 2013) (finding the threat of reputational harm to a single individual to be irreparable). Missouri does not dispute that the 20-week Gestational Age Provision would prohibit about 100 abortions each year in Missouri, or that the 8-week Provision would prohibit approximately half of all reported abortions in the state—and for purposes of the irreparable-harm inquiry, the prohibition of even a single pre-viability abortion would suffice. The district court concluded that this was "a significant interference with plaintiffs' service and the rights of its prospective patients," RHS I, 389 F. Supp. 3d at 638, and Missouri offers nothing to counter that conclusion.

The threat of irreparable harm posed by the Down Syndrome Provision is a closer call, but nevertheless weighs in favor of RHS. After receiving a supplemental declaration from Dr. McNicholas, the district court found that "at least a small number of women" would be affected by this provision. On appeal, Missouri argues that RHS failed to show that any patients seek abortions based "solely" on prenatal diagnoses, or potential diagnoses, of Down syndrome.[8] But RHS is not required to prove with certainty the threat of irreparable harm. The standard merely requires "plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence

---

[8]This argument is curious, as it suggests that the Missouri legislature passed a statute to ban abortions for a category of patients that may not, or at least may not currently, exist.

of an injunction." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). Missouri has offered no evidence to rebut the district court's finding that "the facts reviewed show a very high likelihood" of a "Down [s]yndrome motivated abortion request during litigation." RHS II, 408 F. Supp. 3d at 1052.

Moreover, Dr. McNicholas said that if the Down Syndrome Provision takes effect, (1) she and other physicians in Missouri would "face unjustifiable risk in providing abortion care to patients if [they] know that a patient has had" a prenatal diagnosis, or a potential diagnosis, of Down [s]yndrome, and (2) as a result, "[i]f a patient with a Down [s]yndrome diagnosis seeks services . . . [they would] be forced to turn her away and advise her that she cannot get this care in Missouri." The district court did not clearly err in finding that "the most likely scenario, from plaintiffs' filings, would be the provider's declining a requested abortion, *in terrorem*." Id. at 1053.[9] And while the Down Syndrome Provision might impact fewer people than the

_____

[9]The dissent characterizes RHS's claimed harm as a self-inflicted response to a "speculative risk of sanctions" and disputes the district court's finding of irreparable harm on that basis. But the district court did not rely on a "speculative risk." Rather, after hearing argument and considering the evidence, the district court made a factual finding that the Down Syndrome Provision would likely be enforced against RHS even where the medical provider knows only of "a Down syndrome diagnosis (or even a strong suspicion based on testing)"—that is, even absent certain knowledge that the patient is seeking an abortion "solely" because of Down Syndrome. RHS II, 408 F. Supp. 3d at 1052; cf. Alexis Bailly Vineyard, Inc. v. Harrington, 931 F.3d 774, 778 (8th Cir. 2019) (conducting injury-in-fact inquiry for purposes of standing and distinguishing Clapper v. Amnesty Int'l USA, 568 U.S. 398 (2013), from cases where the plaintiffs "are themselves the objects of a challenged statute" and thus, "must merely allege an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, [where] there exists a credible threat of prosecution thereunder." (cleaned up)). RHS's inability to provide pre-viability abortions to patients with a fetal diagnosis (or suspected diagnosis) of Down Syndrome due to a real threat of prosecution results in a likelihood of irreparable harm

Gestational Age Provisions, the nature of the harm—the inability to obtain an abortion before fetal viability—is at least equally significant. Thus, the district court concluded that absent a preliminary injunction, RHS would be unable to provide pre-viability abortions both to the patients who would otherwise obtain one "solely" on the basis of a fetal diagnosis of Down [s]yndrome, and to the patients for whom the diagnosis is only part of the motivation, causing both types of patients to lose "the Constitutional right to which [they are] currently entitled." Id. Because the district court's carefully considered "finding . . . is plausible in light of the full record," it "must govern." June Med. Servs., 140 S. Ct. at 2128 (plurality opinion) (cleaned up) (quoting Cooper v. Harris, 137 S. Ct. 1455, 1465 (2017)).

2.

The remaining two factors—the balance of hardships and the public interest—also weigh in favor of RHS as to the Down Syndrome Provision and the Gestational Age Provisions.

Missouri contends that "the harms inflicted on the State and innocent third parties from enjoining the enforcement of HB 126 would be extremely severe" because an injunction would prevent the State from advancing "compelling state interests," including "the loss of innocent human life." As the district court appropriately acknowledged, "federal courts should generally be very cautious before delaying the effect of State laws." RHS I, 389 F. Supp. 3d at 637. Nonetheless, Missouri has failed to demonstrate that its policy priorities outweigh (1) the public

---

to those patients. Though the dissent may "have weighed the evidence differently," that is not enough to make the district court's finding clearly erroneous. Anderson v. City of Bessemer City, 470 U.S. 564, 574 (1985).

-13-

interest in access to pre-viability abortions, or (2) the significant interference with RHS's business and the harm to pregnant individuals who might seek a pre-viability abortion before final judgment in this case. See RHS II, 408 F. Supp. 3d at 1052 ("[T]he State Defendants have not and are unlikely to belittle the significance of even a few abortions during litigation . . . ."); cf. Brady v. Nat'l Football League, 640 F.3d 785, 792-94 (8th Cir. 2011) (granting stay of district's order pending appeal even where both parties were "likely to suffer some degree of irreparable harm" because the movant made a "strong showing that it is likely to succeed on the merits"); Little Rock Fam. Plan. Servs. v. Rutledge, 397 F. Supp. 3d 1213, 1322 (E.D. Ark. 2019) (finding that enjoining abortion regulations would not irreparably harm State because "the State has no interest in enforcing laws that are unconstitutional" (citing Hisp. Int. Coal. of Ala. v. Governor of Ala., 691 F.3d 1236, 1249 (11th Cir. 2012))), aff'd in relevant part, 984 F.3d 682 (8th Cir. 2021).

For these reasons, we find no error in the district court's conclusion that the balance of the equities favors injunctive relief.

## IV.

Because the district court did not abuse its discretion in granting preliminary injunctions enjoining enforcement of the Gestational Age Provisions and the Down Syndrome Provision, we affirm.

STRAS, Circuit Judge, concurring in the judgment in part and dissenting in part.

A preliminary injunction is hard to get, all the more so when the target is a democratically enacted state law. *See Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732–33 (8th Cir. 2008) (en banc). The court makes it easy,

-14-

however, by relaxing the rules to let Reproductive Health Services[10] have one, despite its failure to show a "threat of irreparable harm" from Missouri's Down Syndrome Provision. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc). I would apply the usual rules and vacate the injunction.

I.

Under Missouri's Down Syndrome Provision, no one may perform an abortion with "*know[ledge]* that the woman is seeking [one] *solely because of* a prenatal diagnosis, test, or screening indicating Down Syndrome or the potential of Down Syndrome in an unborn child." Mo. Rev. Stat. § 188.038.2 (emphasis added). Even before the law took effect, Reproductive Health Services challenged it and requested a preliminary injunction to prevent state officials from enforcing it against anyone. *See Rodgers v. Bryant*, 942 F.3d 451, 460–65 (8th Cir. 2019) (Stras, J., concurring in part and dissenting in part) (highlighting the problems with universal injunctions).

The district court initially refused to grant one because Reproductive Health Services had not shown that "the inability to schedule 'Down [S]yndrome abortions' would be likely to interfere with the abortion rights of real-life women." In plain English, the court was saying that there was no evidence that the law would create any real-world harm, or even a threat of it. It left the door open, however, if the clinic could come up with something more.

The more came in the form of a supplemental declaration by the clinic's chief medical officer, Dr. Colleen McNicholas, who said:

---

[10]"Reproductive Health Services" refers collectively to the plaintiffs in this case: Reproductive Health Services of Planned Parenthood of the St. Louis Region, Inc., which claims to be "the only generally available source of abortion care in Missouri," and Dr. Colleen P. McNicholas, the facility's chief medical officer and an abortion provider.

> [W]ithin approximately the last 12 months, I do specifically recall that three of the patients that I treated in Missouri had received a fetal diagnosis of Down [S]yndrome.
>
> . . .
>
> I also recall that I provided abortion care to numerous other patients that had received a fetal diagnosis—I would estimate approximately one to four cases per week over the past year—but cannot recall whether that diagnosis was Down [S]yndrome or another genetic or structural anomaly, if I had that information at the time. Because Down [S]yndrome is the most common fetal aneuploidy, it is likely that some of these other instances did involve such a diagnosis.

(Footnote omitted). This declaration was enough for the district court to have a change of heart. Combining the declaration with its own "[c]ommon understanding," and taking "judicial notice" of the fact that a woman would "often" receive "a Down [S]yndrome diagnosis" with "dismay," the court "suppose[d] that" some of these women requested an abortion because of it. If so, the court said, others likely would too, and the law would threaten the ability of real-life women to get one, creating the threat of irreparable harm that was missing before. Whether more is required to grant a preliminary injunction is the question posed to us today. *See Rounds*, 530 F.3d at 732 n.5.

## II.

"A preliminary injunction is an extraordinary remedy . . . ." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). In deciding whether one is appropriate, there are four factors to consider: "(1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest." *Id.* The problem for Reproductive

Health Services is that it never established a "threat of irreparable harm, . . . an independently sufficient ground upon which to deny a preliminary injunction." *Id.*

A threat of irreparable harm is exactly what it sounds like: "a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (quotation marks omitted). This is no small task. At a minimum, Reproductive Health Services had to show that the law was likely to prevent a woman from getting an abortion she otherwise would have lawfully received. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (explaining that "*likely*" harm is enough).

The Down Syndrome Provision itself tells us how the harm would have to occur. *See* Mo. Rev. Stat. § 188.038.2. It is not enough for a woman to receive a prenatal diagnosis, test, or screening of Down Syndrome (or the potential for it) in an unborn child and then seek an abortion. Rather, for the statute to apply, (1) the abortion must be "solely because of" it; and (2) the provider must actually "know[]" of that fact. *Id.* Even when providers are aware of a positive Down Syndrome diagnosis, for example, nothing prevents them from performing an abortion if they know nothing more. Nor is there any restriction when providers know that the diagnosis is *one* reason for the abortion but remain in the dark about whether there are others.

Contrast these requirements with what Dr. McNicholas said in her declaration. According to her, she treated three women who "had received a fetal diagnosis of Down [S]yndrome" over "the last 12 months," and it was "likely" that there had been others too. The declaration is conspicuous for what it does not say. Nowhere does it mention whether any of these women sought an abortion "solely because of" their prenatal diagnoses, much less whether she knew it at the time. *Id.* Both are required for Missouri's Down Syndrome Provision to apply. *See id.*

-17-

A.

Causation poses the biggest hurdle for Reproductive Health Services. No matter how many of Dr. McNicholas's patients have received a positive Down Syndrome diagnosis—three, three hundred, or three thousand—nothing in her declaration establishes that any of them sought an abortion *solely because of* it. *See id.*

The burden of establishing entitlement to a preliminary injunction always rests with the party seeking one. *See Watkins Inc.*, 346 F.3d at 844. There may well be women in Missouri who terminate their pregnancies solely because of a positive Down Syndrome diagnosis, test, or screening, but the problem is that Reproductive Health Services has not identified any of them. It instead asks us to fill in the gaps—basically, guess—that there are women out there who do so, despite the variety of "health, family, financial, [and] other personal reasons" that can factor into a decision to terminate a pregnancy. *Preterm-Cleveland v. McCloud*, 994 F.3d 512, 526 (6th Cir. 2021) (en banc) (plurality opinion). Courts are not supposed to grant injunctions based on guesses.

The district court decided to guess anyway. When Dr. McNicholas failed to say whether any of the women she treated had sought an abortion solely because of a positive diagnosis, the court used its imagination:

> [c]ommon understanding and judicial notice would conclude that a Down [S]yndrome diagnosis (or even a strong suspicion based on testing) would often be received with dismay by a pregnant woman and any family members. If an abortion were sought thereafter, most of us, including an abortion provider, would *suppose* that the diagnosis was the principal cause of the request, and that a jury or licensing agency would have little trouble with the "sole cause" requirement for a violation. As the Chief Justice recently observed, quoting Judge Friendly, "we are not required to exhibit a naiveté from

-18-

which ordinary citizens are free." *Dept. of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019).

(Emphasis added).

These "[c]ommon[ly] underst[ood]" facts are ones that Dr. McNicholas, who performs hundreds of abortions a year, apparently could not say herself. I find it hard to believe that the district court knows more about the motivations of her patients than she does. And this "[c]ommon understanding" is remarkable for another reason: it assumes that children with Down Syndrome are unwanted. The irony is not lost on me, for this is the very discrimination that Missouri seeks to prevent.

Nor does "judicial notice" advance the ball. It applies to obvious facts—those that are "capable of . . . instant and unquestionable demonstration." *United States v. Gould*, 536 F.2d 216, 219 (8th Cir. 1976) (quoting 9 John Henry Wigmore, *Evidence* § 2571, at 548 (1940)). A court may well be able to take judicial notice of a straightforward fact like the total number of women who live in Missouri, but not the reasons why some of them have abortions. It is neither obvious nor "unquestionable," *id.*, despite what the district court may have believed, that a woman would receive a positive Down Syndrome diagnosis "with dismay" and then abort her unborn child *solely* because of it. These are facts that must be proven, not "suppose[d]."

B.

Missouri's Down Syndrome Provision requires more than just an ultra-strict causal link. The provider actually has to *know* that the link is present. *See* Mo. Rev. Stat. § 188.038.2. Absent knowledge that a Down Syndrome diagnosis is the sole reason for an abortion, the statute does not apply. *See id.*

Dr. McNicholas all but admits in her declaration that she has no idea how many women, if any, seek an abortion solely for that reason. *See id.* Consider her words carefully. In addition to never identifying any women who sought abortions "solely because of" a Down Syndrome diagnosis, she goes on to say that "there is generally no medical need for [her], or any other physician providing abortion care at [the clinic,] to know a patient's reason for seeking an abortion or to distinguish between one particular fetal diagnosis or another in order to provide compassionate, safe abortion care." If there is no medical reason to ask, and no evidence that the reason for seeking an abortion is routinely volunteered, then the statute *itself* cannot create the "threat of irreparable harm." *Dataphase Sys., Inc.*, 640 F.2d at 114.

Rather, the harm comes from Dr. McNicholas herself, or at least her view of the law. She claims that, if she learns of any fetal anomaly, then she will have to ask whether it is Down Syndrome, just because of the "legal risk" involved. If a woman then admits that her unborn child has a positive Down Syndrome diagnosis, Dr. McNicholas will "turn her away and advise her that she cannot get this care in Missouri." This statute-made-me-do-it theory would make sense if the statute made her do it. But it does not.

Nothing in the Down Syndrome Provision requires Dr. McNicholas to ask about fetal diagnoses or "turn . . . away" women who reveal one. *See* Mo. Rev. Stat. § 188.038.2. And with no medical reason to inquire, it is her choice to ask the question. Then, if a woman answers by saying she has received a positive Down Syndrome diagnosis, it is again Dr. McNicholas's choice not to perform the abortion, assuming the woman has not told her that the diagnosis is the sole reason she is seeking it. We cannot enjoin a law based on what someone *thinks* it says, rather than what it *actually* says. *Cf. Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (explaining that plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending").

Perhaps what Dr. McNicholas is really trying to say is that the statute will "chill" her practice, based on the potential legal risk involved, even if she cannot identify anyone who would be directly affected by it. *Cf. Republican Party of Minn., Third Cong. Dist. v. Klobuchar*, 381 F.3d 785, 791–93 (8th Cir. 2004). The court seems persuaded:

> The district court did not clearly err in finding that "the most likely scenario, from plaintiffs' filings, would be *the provider's declining* a requested abortion, *in terrorem*." . . . Thus, the district court concluded that absent a preliminary injunction, [the plaintiffs] would be unable to provide pre-viability abortions both to the patients who would otherwise obtain one "solely" on the basis of a fetal diagnosis of Down [S]yndrome, and to the patients for whom the diagnosis is only part of the motivation, causing both types of patients to lose "the Constitutional right to which [they are] currently entitled."

*Ante* at 12–13 (emphasis added) (second and third brackets in original).

Even if this reasoning sounds plausible, there are obvious problems with it. A chilling effect can only support a claim if a statute is vague or overbroad, and even then, only when the challenge is brought under the First Amendment. *See* 1 Rodney A. Smolla, *Smolla and Nimmer on Freedom of Speech* §§ 6:4, 6:14 (2021); *see also Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002) (overbreadth); *Reno v. Am. Civ. Liberties Union*, 521 U.S. 844, 871–74 (1997) (vagueness). It is tied to an exceptionally narrow doctrine that allows a party to establish an injury through the "deterrent effect" a law has on protected expression, but only if the chill is "objectively reasonable." *Republican Party of Minn.*, 381 F.3d at 792 (quotation marks omitted); *see Balogh v. Lombardi*, 816 F.3d 536, 541–42 (8th Cir. 2016). The problem is that abortions are not protected expression, Missouri's Down Syndrome Provision is not vague or overbroad (nor is there any claim that it is), and the chill is not an objectively reasonable response to the statute. The point is that Dr. McNicholas cannot threaten to cause the harm herself by overcorrecting her own behavior to avoid the speculative risk of sanctions. *See Salt Lake Trib.*

-21-

*Publ'g Co. v. AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003) ("We will not consider a self-inflicted harm to be irreparable . . . ."); *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995) ("If the harm complained of is self-inflicted, it does not qualify as irreparable.").

The court's response brings to mind the classic game of telephone. Dr. McNicholas said *only* that some of her patients have had abortions after receiving a Down Syndrome diagnosis. The district court then put its own gloss on her statement when it used its "[c]ommon understanding and judicial notice" to announce that "a jury or licensing agency would have little trouble with the 'sole cause' requirement for a violation" if a woman sought an abortion in those circumstances. Today, the court adds yet another gloss by declaring that the district court *found* "that the Down Syndrome Provision would likely be enforced against [Reproductive Health Services] . . . even absent certain knowledge that the patient is seeking an abortion 'solely' because of Down Syndrome." *Ante* at 13 n.9. Just like in the telephone game, the message in the end bears little resemblance to the message at the start. Dr. McNicholas did not say any of these things, and the district court did not actually make a factual finding. Indeed, the district court relied on "[c]ommon understanding and judicial notice" precisely because there was no evidence on these points.[11] *See* Fed. R. Civ. P. 52(a)(6) (providing that the clear-error standard applies to findings "based on oral or other *evidence*" (emphasis added)); *see also Am. Prairie Constr. Co. v. Hoich*, 560 F.3d 780, 796 (8th Cir. 2009) (reviewing a "decision to take judicial notice [of a fact] for abuse of discretion").

Reproductive Health Services wants us to fill in the gaps on causation and knowledge through guesswork. That is not how preliminary injunctions work. It had the burden to connect all the dots for us, and its failure to do so provides reason enough to vacate the preliminary injunction. *See Watkins Inc.*, 346 F.3d at

---

[11]As for the district court's *actual* findings, I agree that not a single one of them is clearly erroneous. They simply fall short of justifying a preliminary injunction.

-22-

844 (explaining that failure to establish a threat of irreparable harm "is an independently sufficient ground upon which to deny a preliminary injunction").

## III.

Nothing in *Little Rock Family Planning Services v. Rutledge*, 984 F.3d 682 (8th Cir. 2021), is to the contrary. In *Rutledge*, a panel of this court concluded that the plaintiffs were likely to succeed on the merits of a challenge to a similar Arkansas statute. *See id.* at 688–90. Even if *Rutledge* creates a likelihood of success on the merits here, Reproductive Health Services is still not entitled to a preliminary injunction without showing a threat of irreparable harm. *See Dataphase Sys., Inc.*, 640 F.2d at 114 n.9.

In any event, I think there is reason to doubt whether *Rutledge* was correctly decided, even if this panel has to follow it. *See Mader v. United States*, 654 F.3d 794, 800 (8th Cir. 2011) (en banc) ("It is a cardinal rule in our circuit that one panel is bound by the decision of a prior panel." (quotation marks omitted)); *see also Preterm-Cleveland*, 994 F.3d at 516, 535 (concluding that a challenge to a similar, but even more restrictive, law was not likely to succeed on the merits). It treated Arkansas's Down Syndrome Provision as a "complete prohibition o[n] abortions"—a "ban," so to speak—not just a "regulation." *Rutledge*, 984 F.3d at 688–90. This distinction is critical because, under our precedent, a pre-viability ban is *categorically* unconstitutional. *See id.* at 687–88; *MKB Mgmt. Corp. v. Stenehjem*, 795 F.3d 768, 772–73 (8th Cir. 2015); *Edwards v. Beck*, 786 F.3d 1113, 1117 (8th Cir. 2015) (per curiam). A pre-viability regulation, on the other hand, is only unconstitutional if it has the "purpose or effect" of "plac[ing] a substantial obstacle in the path of a woman seeking an abortion." *Gonzales v. Carhart*, 550 U.S. 124, 146 (2007) (quoting *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 878 (1992) (plurality opinion)).

We have not made it easy to tell the difference between the two. In *Edwards*, we explained that a ban "prohibits women from making the ultimate decision to terminate a pregnancy." 786 F.3d at 1117. A regulation, by contrast, has only an "incidental effect" on the decision by "making it more difficult or more expensive to procure an abortion." *Gonzales*, 550 U.S. at 158 (quoting *Casey*, 505 U.S. at 874 (plurality opinion)). The distinction is only complicated by the fact that a regulation can easily be reframed as a ban: if its requirements are not met, then a woman will be "completely prohibited" from having an abortion. *Ante* at 9.

As slippery as the dividing line seems to be, if I were writing on a blank slate, I would conclude that Missouri's Down Syndrome Provision is a regulation. Recall that it says that "[n]o person shall perform or induce an abortion on a woman if the person knows that the woman is seeking the abortion solely because of a prenatal diagnosis, test, or screening indicating Down Syndrome or the potential of Down Syndrome in an unborn child." Mo. Rev. Stat. § 188.038.2. Interpreting the statute as an ordinary person would, *see Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018), all it does is limit the reasons for an abortion in certain narrow circumstances. As long as a woman has at least two reasons for seeking an abortion, or her provider never knows that a positive Down Syndrome diagnosis, test, or screening is her sole reason for getting one, "the ultimate decision" still lies with her. *Edwards*, 786 F.3d at 1117 (quoting *Casey*, 505 U.S. at 879 (plurality opinion)). The statute is, in other words, a regulation, not a ban. *See id.*

An example may help. Title VII of the Civil Rights Act of 1964 makes it unlawful "for an employer . . . to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). No one would suggest that Title VII is a *ban* on firing employees. Even under Title VII's broad language, which requires the reason to be nondiscriminatory, "the ultimate decision" to terminate someone still rests with the employer. *Edwards*, 786 F.3d at 1117 (quoting *Casey*, 505 U.S. at 879 (plurality

-24-

opinion)); *see Berg v. Norand Corp.*, 169 F.3d 1140, 1146 (8th Cir. 1999) (noting that "[t]he employment-at-will doctrine, allowing an employer to terminate an employee for any lawful reason, is [still] alive and well").

The same is true of Missouri's Down Syndrome Provision. Women remain free to terminate their pregnancies for nondiscriminatory reasons. Indeed, Missouri's law is even more permissive than Title VII in at least two respects: an abortion is still available, even after a positive diagnosis, test, or screening, as long as (1) the provider does not know why a woman is seeking an abortion; *or* (2) the discriminatory reason is accompanied by at least one nondiscriminatory reason. *Compare* Mo. Rev. Stat. § 188.038.2 (setting out the "solely because of" requirement), *with* 42 U.S.C. § 2000e-2(m) (prohibiting discriminatory employment practices "even [when] other factors also motivated the practice"). Just like Title VII does not "ban" employers from firing employees, neither does Missouri's law "ban" women from terminating their pregnancies. *Rutledge*, unfortunately, seems to foreclose this common-sense analysis.

IV.

I would accordingly vacate the preliminary injunction against Missouri's Down Syndrome Provision.

_____