# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
January 20, 2022

Lyle W. Cayce
Clerk

No. 18-30699

Planned Parenthood Gulf Coast, Incorporated;
Planned Parenthood Center for Choice; Jane Doe #1;
Jane Doe #2; Jane Doe #3,

*Plaintiffs—Appellees*,

*versus*

Courtney N. Phillips, *in her official capacity as Secretary of the
Louisiana Department of Health*,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:18-CV-176

ON PETITION FOR REHEARING EN BANC

Before Higginbotham, Elrod, and Ho, *Circuit Judges*.

Jennifer Walker Elrod, *Circuit Judge*:

Treating the Petition for Rehearing En Banc as a Petition for Panel Rehearing, the Petition for Panel Rehearing is GRANTED. We WITHDRAW the court's prior opinion in this case and substitute the following.

No. 18-30699

\*     \*     \*

Two Planned Parenthood entities and three Jane Does brought this lawsuit under 42 U.S.C. § 1983 alleging that the Louisiana Department of Health is unlawfully declining to act on Planned Parenthood Center for Choice's application for a license to provide abortion services in Louisiana. The Department moved to dismiss under Federal Rule of Civil Procedure 12(b)(1) on several bases, including sovereign immunity.[1] The district court denied the motion without prejudice, and the Department filed this interlocutory appeal. The plaintiffs moved to dismiss this interlocutory appeal, arguing that we lack appellate jurisdiction. Because the Department asserted sovereign immunity in the district court, we DENY the motion to dismiss the appeal. Furthermore, at least one of the plaintiffs' claims for injunctive relief is a valid invocation of federal jurisdiction under *Ex parte Young.* The case is REMANDED for further proceedings consistent with this opinion.

## I.

Plaintiff Planned Parenthood Gulf Coast provides non-abortion healthcare services at its clinics in Texas and Louisiana. Gulf Coast also participates in Texas's and Louisiana's Medicaid programs. The three Jane Doe plaintiffs are Gulf Coast patients.

Plaintiff Planned Parenthood Center for Choice, a Texas Corporation, has a facilities and services agreement with Gulf Coast to provide abortion services at Gulf Coast clinics and provides abortions services at Gulf Coast's

---

[1] The nominal defendant is Dr. Courtney Phillips, Secretary of the Louisiana Department of Health, who is substituted for former Secretary Dr. Rebekah Gee pursuant to Federal Rule of Appellate Procedure 43(c)(2). Phillips is sued only in her official capacity.

clinics in Texas. Currently, however, Planned Parenthood is not licensed to provide abortions anywhere in Louisiana. In September 2016, Planned Parenthood applied for a license to operate an abortion clinic at a Gulf Coast clinic in New Orleans, Louisiana. About six weeks later, the Department notified Planned Parenthood that its application was incomplete and missing information, which triggered a 90-day deadline for Planned Parenthood to respond.[2] Planned Parenthood did not respond until five months later, in April 2017, allegedly with the Department's permission to postpone the response deadline. The Department continued its review of the application, including inspecting Gulf Coast's New Orleans clinic in May 2017.

Meanwhile, in December 2016, a Select Investigative Panel of the United States House of Representatives began investigating Planned Parenthood's handling of fetal remains. The investigation was spurred in part by videos recorded at Gulf Coast's headquarters in Texas that "depict[ed] two individuals posing as representatives from a fetal tissue procurement company discussing the possibility of a research partnership with PP Gulf Coast." *Planned Parenthood of Greater Tex. Fam. Plan. & Preventative Health Servs., Inc. v. Kauffman*, 981 F.3d 347, 351 (5th Cir. 2020) (*en banc*).[3] Among other findings, the Select Committee's Final Report related evidence that Gulf Coast had illegally received or sought financial compensation in exchange for transferring fetal body parts to academic institutions in Texas.[4] In December 2016, the Select Committee referred

---

[2] *See* La. Admin. Code tit. 48, pt. I, § 4405(E) (Jan. 2021) (giving an applicant "90 calendar days from receipt of the notification to submit the additional requested information").

[3] The videos, in their entirety, are publicly available. *Kauffman*, 981 F.3d at 382 n.10 (Elrod, J., concurring) (linking to videos).

[4] *See* 42 U.S.C. § 289g-2; Tex. Penal Code Ann. § 48.02.

several of those violations to the Texas Attorney General for investigation and released a 450-page report documenting its findings.

The Department decided to withhold action on Planned Parenthood's application to let the Texas investigation run its course. In June 2017, the Department sent Planned Parenthood a letter communicating its decision to defer resolution of the application. The letter explained that, under Louisiana law, "the Department may deny a license if an investigation or survey determines that the applicant is in violation of any federal or state law or regulation."[5]

Referencing the Select Committee's "criminal and regulatory referral to the Texas Attorney General related to the operations of Planned Parenthood Gulf Coast," the letter explained that the Department needed to "conduct[] an investigation to determine if Planned Parenthood Center for Choice, either in its own name or through the actions of Planned Parenthood Gulf Coast, is in violation of any federal or state law or regulation." The letter concluded by saying that the Department "is neither approving nor denying [Planned Parenthood's] application," but that "[a]fter the conclusion of this investigation, [the Department] will be in a position to make a determination on [Planned Parenthood's] license application."

Then, in January 2018, Louisiana received a confidential complaint regarding activity by Gulf Coast in Louisiana. The Louisiana Attorney General is currently investigating that complaint for potential action by the state. Because Planned Parenthood has a facilities and services agreement with Gulf Coast to use Gulf Coast's space, services, and staff, the

---

[5] *See* La. Stat. Ann. § 40:2175.6(G) (stating that the Department may deny a license "if an investigation or survey determines that the applicant or licensee is in violation of any provision of this Part, in violation of the licensing rules promulgated by the department, or in violation of any other federal or state law or regulation").

No. 18-30699

Department views the investigation as necessarily implicating Planned Parenthood.

In February 2018, the plaintiffs sued the Department, asserting two sets of claims.[6]  The first set—the licensing claims—challenge the Department's handling of their application for a license to provide abortion services in Louisiana.  The plaintiffs allege that the Department's letter and decision to await more information constituted a "constructive denial" of Planned Parenthood's application and that the Department's licensing process is a "sham" intended to prevent Planned Parenthood from performing abortions.  The plaintiffs assert that this alleged denial violates their rights to substantive due process, procedural due process, and equal protection.  They do not challenge the underlying statutes or regulations that govern abortion-clinic licensing; they challenge only the Department's handling of this particular application.

---

[6] The plaintiffs' claims, as set out by the district court, are as follows:

Claim I alleges that the [constructive] denial and [Louisiana's House Bill 606 ("HB 606")] violate [Planned Parenthood's] patients' due process rights to liberty and privacy as guaranteed by the Fourteenth Amendment because they have the unlawful purpose or effect of imposing an undue burden on women's exercise of their right to an abortion.  Claim II alleges that the denial and HB 606 "single out" [Gulf Coast], [Planned Parenthood], and their patients for unfavorable treatment without justification in violation of the Equal Protection Clause.  Claim III alleges that HB 606 violates 42 U.S.C. § 1396a(a)(23) by denying [Gulf Coast's] Louisiana Medicaid patients the right to choose any willing, qualified provider.  Claim IV alleges that HB 606 violates the First Amendment and the Due Process Clause of the Fourteenth Amendment by placing an unconstitutional condition on [Gulf Coast's] eligibility to participate in Medicaid based on the Plaintiffs' exercise of constitutionally protected activity.  Finally, Claim V alleges that the denial violates [Planned Parenthood's] right to procedural due process by denying [Planned Parenthood] a license without adequate procedural protections.

No. 18-30699

On their licensing claims, the plaintiffs seek a declaratory judgment that the "denial" of their license violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment and "is therefore void and of no effect." They also seek three injunctions on their licensing claims: (1) an injunction preventing the Department from "withholding approval" of its application; (2) an injunction ordering the Department to "promptly rule" on the application "in accordance with all applicable constitutional requirements"; and (3) an injunction ordering the Department to grant the application and issue an abortion-clinic license to Planned Parenthood.

The plaintiffs' second set of claims—their funding claims—challenges Louisiana's House Bill 606 ("HB 606"), which prohibits giving taxpayer funds, including Medicaid funds, to abortion providers and their affiliates.[7] The plaintiffs assert that, in the event that Planned Parenthood is eventually granted a license, HB 606 would require Louisiana to cease providing Gulf Coast with Medicaid funding. The plaintiffs claim that HB 606 violates their due process, equal protection, and First Amendment rights, as well as a provision of the federal Medicaid Act.[8] They seek both declaratory and injunctive relief on the funding claims.

The Department moved to dismiss the complaint for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). The Department asserted sovereign immunity from the licensing claims because, in the Department's view, those claims call on the district court to "supervise an ongoing State-law licensing process—the very kind of situation" that deprives a federal court of jurisdiction under *Pennhurst*. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) (holding

---

[7] *See* La. Stat. Ann. §§ 36:21(B), 40:1061.6(A)(2), 40:2175.4(B).

[8] 42 U.S.C. § 1396a(a)(23).

No. 18-30699

that sovereign immunity prohibits federal courts from "instruct[ing] state officials on how to conform their conduct to state law").

Likewise, the Department argued that granting the plaintiffs' requested relief on their licensing claims would violate *Pennhurst* because they "demand a change in the Department's interpretation of State law." It also urged that the licensing claims involve the kinds of state-law entanglements that require the district court to abstain and dismiss under *Burford*. *Burford v. Sun Oil Co.*, 319 U.S. 315, 318, 332 (1943) (holding that a federal court may abstain from exercising its equity jurisdiction where doing so would "be prejudicial to the public interest" or would "so clearly involve[] basic problems of [State] policy" (quoting *United States ex rel. Greathouse v. Dern*, 289 U.S. 352, 360 (1933))). Finally, the Department urged dismissal because the plaintiffs' funding claims are contingent on the barred licensing claims, are not ripe, and are therefore not justiciable.

The plaintiffs responded, arguing that the claims are ripe because the Department's actions up to this point have been "pretextual" and that the Department "will continue to stall until this Court orders it to act." They also countered that *Burford* did not require the district court to abstain because it is "unclear" whether state-court relief is available, and that *Pennhurst* does not foreclose jurisdiction because their licensing claims are about federal rights.

The district court denied the Department's motion to dismiss without prejudice to the renewal of the Department's jurisdictional arguments once the case returns to the district court after this interlocutory appeal. The Department appealed. Thereafter, the plaintiffs filed a motion to dismiss this appeal for lack of jurisdiction, which was carried with the case.

II.

First, we must decide whether we have jurisdiction over this

7

interlocutory appeal. Normally, our jurisdiction reaches only appeals from "final decisions." 28 U.S.C. § 1291.[9] Because an order denying a motion to dismiss is not a final decision, it "ordinarily does not constitute an immediately appealable order." *Thomas ex rel. D.M.T. v. Sch. Bd. St. Martin Par.*, 756 F.3d 380, 383 (5th Cir. 2014).

Nevertheless, beginning with *Cohen v. Beneficial Industrial Loan Corp.*, the Supreme Court has recognized narrow exceptions to this rule under what is now termed the collateral-order doctrine. 337 U.S. 541, 545–47 (1949). The collateral-order doctrine permits appellate courts to hear appeals of interlocutory orders that "[1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] [are] effectively unreviewable on appeal from a final judgment." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978); *accord Microsoft Corp. v. Baker*, 137 S. Ct. 1702, 1708 n.3 (2017).

In *Puerto Rico Aqueduct & Sewer Authority v. Metcalf & Eddy, Inc.*, the Supreme Court concluded that the collateral-order doctrine permits appeal of a district court's order denying a state "immunity from suit." 506 U.S. 139, 141, 145 (1993). Because "[d]enials of States' and state entities' claims to [sovereign] immunity purport to be conclusive determinations that they have no right not to be sued in federal court," the Supreme Court held that the "elements of the *Cohen* collateral order doctrine" were satisfied and therefore expanded the doctrine to appeals of denials of sovereign immunity. *Id.* at 144–45.

The Department argues that we have appellate jurisdiction under *Metcalf & Eddy* because, it says, it has always asserted "immunity from suit."

---

[9] The Department does not argue that this appeal satisfies any of the exceptions to this rule set out in 28 U.S.C. § 1292.

*Id.* at 145. The Department says that it has consistently argued that sovereign immunity bars the plaintiffs' "entire suit." *McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 411 (5th Cir. 2004) (exercising jurisdiction over appeal of a denial of a motion to dismiss "asserting [sovereign] immunity from the entire suit"). In its motion to dismiss, the Department stated that the district court lacked jurisdiction over the entire case. Specifically, it urged that the plaintiffs' licensing claims were barred by sovereign immunity and *Pennhurst*,[10] that all of the requested forms of relief on the licensing claims were barred by sovereign immunity and *Pennhurst*,[11] that the funding claims were enveloped by and contingent on the licensing claims,[12] and that the funding claims were unripe anyway. Thus, the Department argues that it asserted immunity from this suit and that we have jurisdiction.

---

[10] The Department's reply in support of its motion to dismiss states that "*Pennhurst* covers all the licensing claims."

[11] The Department's reply in support of its motion to dismiss states that "*Pennhurst* covers all the licensing claims, and all the relief Plaintiffs request on those claims, because all demand a change in the Department's interpretation of State law." The Department's motion to dismiss states that "the relief Plaintiffs demand on their license claim—including an injunction requiring issuance of a license to Planned Parenthood—would require this Court to override the Department's interpretation of State law. This Court has no authority to issue such relief." The motion to dismiss also states that, "even if it were appropriate for this Court to review the State's ongoing licensing processes, Plaintiffs are not entitled to the relief they seek from their licensing claim. . . . Plaintiffs demand a declaration . . . and an injunction."

[12] The Department's motion to dismiss states:

Plaintiff[s'] [funding] claim is premised on the theory that *if* [Planned Parenthood] receives a license, then [Planned Parenthood's] State Medicaid funding would be threatened. Plaintiffs' challenge to HB 606 is therefore not even arguably ripe until [Planned Parenthood] receives an abortion clinic license. But [Planned Parenthood] does not have a license. Plaintiffs' [funding] claims are nonjusticiable until a concrete case or controversy arises.

No. 18-30699

The plaintiffs argue that we do not have jurisdiction because, they contend, the Department asserted sovereign immunity from only certain forms of relief, and not others. This argument is without merit. As the Department explained in its motion, "*Pennhurst* covers all the licensing claims, and *all the relief* Plaintiffs request on those claims, because all demand a change in the Department's interpretation of State law."

Alternatively, the plaintiffs argue that the Department asserted sovereign immunity only on the licensing claims and only a ripeness challenge on the funding claims. Because the Department did not assert sovereign immunity from the funding claims independent of the licensing claims, the plaintiffs contend that we do not have jurisdiction under *Metcalf & Eddy*.

But *Metcalf & Eddy* is not as limited as the plaintiffs say that it is. The jurisdictional inquiry is not overly technical; it is straightforward. Under *Metcalf & Eddy*, we ask: Did the state assert sovereign immunity from suit? *See Metcalf & Eddy*, 506 U.S. at 144 ("This withdrawal of jurisdiction effectively confers an immunity from suit."); *see also id.* ("Once it is established that a State . . . [is] immune from suit . . . ."). As we characterized it in *McCarthy*, a proper invocation of sovereign immunity will be from the "entire suit." *McCarthy*, 381 F.3d at 411.

*Metcalf & Eddy*'s straightforward, entire-suit standard fulfills the purpose of jurisdiction over interlocutory appeals in this context, which is to ensure that a state has not been deprived of this "fundamental constitutional protection" before a lawsuit proceeds to trial. *Metcalf & Eddy*, 506 U.S. at 143–45. "[T]he value to the States of their [sovereign] immunity . . . is for the most part lost as litigation proceeds past motion practice." *Id.* at 145. The potential injury is being wrongly "haled into court" and the only way to truly protect that right is to ask simply whether the state asserted immunity

No. 18-30699

from the lawsuit. *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 258 (2011).

Here, we hold that we have jurisdiction because the Department asserted sovereign immunity from this entire lawsuit. Simply put, the Department has always argued that a proper application of sovereign immunity would remove it from this litigation and require dismissal of all claims. We therefore have jurisdiction over this interlocutory appeal.[13]

In rejecting the plaintiffs' argument that we should undertake a hyper-technical inquiry to exercise jurisdiction, we find ourselves in good company. The Supreme Court rejected a similar argument in *Metcalf & Eddy*. There, the respondent argued "that a distinction should be drawn between cases in which the determination of a State['s] . . . claim to [sovereign] immunity is bound up with factual complexities whose resolution requires trial and cases in which it is not." *Metcalf & Eddy*, 506 U.S. at 147. Just as the Supreme Court saw "little basis for drawing such a line" and rejected that argument, we reject the plaintiffs' argument here. *Id.* We have jurisdiction.

### III.

We next examine whether the district court erred in denying the Department's motion to dismiss. As discussed above, the Department first

---

[13] This is not the first time that we have exercised jurisdiction over an interlocutory appeal where the state asserted absolute immunity from only some, and not all, of a plaintiff's claims in the district court. In *BancPass, Inc. v. Highway Toll Administration, L.L.C.*, we held that we had jurisdiction over the interlocutory appeal even though the state agency asserted immunity from a defamation claim, but not from a tortious interference with contract claim. 863 F.3d 391, 396, 398 (5th Cir. 2017). Indeed, this appeal presents an even stronger case for finding jurisdiction than the situation in *Bancpass* did because the state agency in *Bancpass* asserted immunity from only one claim—never arguing that a sovereign-immunity win on that claim would dispose of the entire lawsuit—whereas here the Department has always argued that a win on the sovereign-immunity issue would protect it from the entire lawsuit.

and foremost argues that sovereign immunity mandates dismissal of this entire case.

The states' sovereign immunity is derived from the principle of federalism woven throughout our constitutional framework. Federalism recognizes our dual sovereignties—the states and the federal government—and "secures to citizens the liberties that derive from the diffusion of sovereign power." *Shelby Cnty. v. Holder*, 570 U.S. 529, 543 (2013) (quoting *Bond v. United States*, 564 U.S. 211, 221 (2011)).

Under the Eleventh Amendment, federal courts cannot tell state officials "how to conform their conduct to state law"—for one can hardly imagine "a greater intrusion on state sovereignty." *Pennhurst*, 465 U.S. at 106. Letting a federal court tell state officials how to act under state law would "conflict[] directly with the principles of federalism that underlie the Eleventh Amendment." *Id.* Hence, the Eleventh Amendment generally deprives federal courts of jurisdiction to hear "suits by individuals against nonconsenting states" and suits "against state officials in their official capacities." *McCarthy*, 381 F.3d at 412; *id.* at 418 (Garza, J., concurring in part and dissenting in part).

Importantly, however, sovereign immunity is not boundless and one of its limits is the *Ex parte Young* doctrine. 209 U.S. 123 (1908). The doctrine grants a federal court jurisdiction over a lawsuit against a "state official in his official capacity if the suit seeks prospective relief to redress an ongoing violation of federal law." *Williams ex rel. J.E. v. Reeves*, 954 F.3d 729, 736 (5th Cir. 2020), *stay denied*, 141 S. Ct. 2480 (2021) (mem.). For *Ex parte Young* to apply, "three criteria must be satisfied: (1) A 'plaintiff must name individual state officials as defendants in their official capacities'; (2) the plaintiff must 'allege[] an ongoing violation of federal law'; and (3) the relief sought must be 'properly characterized as prospective.'" *Green Valley*

*Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 471 (5th Cir. 2020) (*en banc*) (internal citations omitted) (first quoting *Raj v. La. State Univ.*, 714 F.3d 322, 328 (5th Cir. 2013); then quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)).

*Ex parte Young* is a "necessary exception" to sovereign immunity, preventing state officials from using their state's sovereignty as a shield to avoid compliance with federal law. *Metcalf & Eddy*, 506 U.S. at 146. The "premise" of the doctrine, which applies to state officials but not to the states themselves, is that a "state official is 'not the State for sovereign-immunity purposes' when 'a federal court commands [her] to do nothing more than refrain from violating federal law.'" *Williams*, 954 F.3d at 736 (quoting *Va. Off. for Prot. & Advoc.*, 563 U.S. at 255). The inquiry requires us to give "careful consideration [to] the sovereign interests of the State as well as the obligations of state officials to respect the supremacy of federal law." *Verizon*, 535 U.S. at 649 (Kennedy, J., concurring).

*Ex parte Young*'s purpose is to "give[] life to the Supremacy Clause" and prevent violations of federal rights. *Green v. Mansour*, 474 U.S. 64, 68 (1985). Accordingly, the exception does not apply when plaintiffs seek to vindicate state-law rights, because there is no "greater intrusion on state sovereignty" than when a federal court instructs a state official on how to conform her conduct to state law. *Pennhurst*, 465 U.S. at 106. "[I]f there are no federal rights for the plaintiff to vindicate then the justification for the *Young* exception is not present in the case and the state's right to [sovereign] immunity should be honored." *McCarthy*, 381 F.3d at 419 (Garza, J., concurring in part and dissenting in part).

"In determining whether the doctrine of *Ex parte Young*" applies, "a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly

No. 18-30699

characterized as prospective.'"  *Verizon*, 535 U.S. at 645 (alteration in original) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring in part and concurring in the judgment)). "[T]he inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim." *Id.* at 646.

## A.

Here, the first and third criteria of *Ex parte Young* are satisfied, because the state official is sued in her official capacity and the plaintiffs seek prospective relief. *See Green Valley*, 969 F.3d at 471. Consequently, our task is to decide whether *Ex parte Young*'s second criterion has been satisfied: Do the plaintiffs allege violations of federal law such that the *Ex parte Young* exception to sovereign immunity allows this lawsuit to proceed in federal court, or do the plaintiffs allege only violations of state law such that sovereign immunity requires dismissal of the entire lawsuit? *See id.*

On their licensing claims, the plaintiffs allege that the Department has "constructively denied" their application and that the investigations purportedly preventing the Department from officially ruling on the application are in fact "shams." The plaintiffs assert that the Department's actions violate their federal constitutional rights to equal protection, substantive due process, and procedural due process. They seek injunctions directing the Department: (1) to "not withhold approval" of the license; (2) to "promptly rule" on the application "in accordance with all applicable constitutional requirements"; or (3) to "grant" the license.

In response, the Department argues that the complaint asserts only state-law claims disguised as federal claims. It says that the plaintiffs' real complaint is that the Department has incorrectly interpreted the Louisiana statute that forbids granting abortion-clinic licenses to applicants in violation

14

of "federal or state law."[14]   Specifically, one way to read the plaintiffs' complaint is that it says that the state statute is confined to actual violations of federal or Louisiana law—not potential violations of other states' laws, as the Department reads the statute.[15]  If that is the real thrust of the complaint, the Department says, then the plaintiffs are asking a federal court to order a state official "to conform [her] conduct to [the plaintiffs' interpretation of] state law," which the Department says that *Pennhurst* forbids.  *Pennhurst*, 465 U.S. at 106.  The Department also argues that all forms of relief sought by the plaintiffs on their licensing claims are barred by *Pennhurst*.

The district court rejected the Department's argument.  It held that the licensing claims were supported by "extensive allegations spanning many years that, when taken in the light most favorable to [the plaintiffs], suggest that [the Department's] current proffered interpretation of state law is the latest in a series of largely pretextual decisions made to indefinitely prevent [the plaintiffs] from providing abortions."  The district court held that "while [the Department] is correct that '*particular abortion providers do not have a federal constitutional right to a license*,' . . . to parse the federal constitutional right a[t] issue as simply the right to 'a license' under state law reads the issue too narrowly at least at this early stage."

We hold that the plaintiffs have established federal jurisdiction for purposes of a Rule 12(b)(1) motion, at least on their requested injunction to "promptly rule."  Under Rule 12(b)(1)'s straightforward inquiry, plaintiffs' procedural due process and equal protection claims seeking an injunction directing the Department to rule on their license application satisfy *Ex parte*

---

[14] *See* La. Stat. Ann. § 40:2175.6(G).

[15] *But see Doe I v. Landry*, 909 F.3d 99, 112 (5th Cir. 2018) ("When the state official charged with implementing a statute has provided an interpretation of how to enforce it, we will defer unless that explanation is inconsistent with the statutory language.").

*Young.* Plaintiffs' complaint alleges that Planned Parenthood is entitled to a license under Louisiana law and that the Department's "constructive denial" of their license application occurred "without sufficient procedural protections." It also alleges that throughout the licensing process Planned Parenthood was treated differently than other similarly situated applicants. An injunction ordering the Department to provide the protections guaranteed by the federal Due Process Clause and heed the requirements of the Equal Protection Clause does not order the Department to conform to state law in violation of *Pennhurst*. *See Brown v. Ga. Dep't of Revenue*, 881 F.2d 1018, 1023 (11th Cir. 1989) ("Under *Pennhurst*, however, the determinative question is not the relief ordered, but whether the relief was ordered pursuant to state or federal law.").

We emphasize that the Rule 12(b)(1) inquiry "does not include an analysis of the merits of the claim," and accordingly do not comment on whether plaintiffs can survive a Rule 12(b)(6) motion to dismiss. *Verizon*, 535 U.S. at 646; *see also McCarthy*, 381 F.3d at 416 ("[T]he Court [in *Verizon*] made clear that analyzing the applicability of the *Ex parte Young* exception should generally be a simple matter, which excludes questions regarding the validity of the plaintiff's cause of action."). We note, however, that to survive a such a motion, plaintiffs' complaint must identify which procedural protections guaranteed by the Due Process Clause are lacking. Allegations that the Department is not following Louisiana law or is applying that law incorrectly are insufficient because "[t]he constitutional procedural standards of the due process clause are . . . wholly and exclusively federal in nature." *Stern v. Tarrant Cnty. Hosp. Dist.*, 778 F.2d 1052, 1059 (5th Cir. 1985) (*en banc*). "[A] violation of state law is neither a necessary nor a sufficient condition for a finding of a due process violation." *Id.*; *see also Snowden v. Hughes*, 321 U.S. 1, 11 (1944) ("Mere violation of a state statute

16

does not infringe the federal Constitution.").[16]  Similarly, to state a valid equal protection claim, plaintiffs must point to other similarly situated applicants who were treated differently.  *See, e.g.*, *Priester v. Lowndes Cnty.*, 354 F.3d 414, 424 (5th Cir. 2004).

## B.

Because the plaintiffs' requested injunction to "promptly rule" on the license application satisfies the requirements of *Ex parte Young*, the plaintiffs have survived the Department's Rule 12(b)(1) motion and the case may proceed.  Because the case will proceed, we need not address the plaintiffs' other requests for injunctive relief; it is for the district court first to decide what forms of relief, if any, are ultimately appropriate. *ODonnell v. Harris Cnty.*, 892 F.3d 147, 163 (5th Cir. 2018) ("[T]he scope of injunctive relief is dictated by the extent of the violation established." (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979))), *overruled on other grounds by Daves v. Dall. Cnty.*, --- F.4th ---, 2022 WL 72201 (5th Cir. 2022).  And because the district court denied the Department's motion to dismiss without prejudice to the renewal of its jurisdictional arguments at a later stage, the Department may reassert its objections to other forms of injunctive relief at that time.

## IV.

The Department raised other issues in the district court that it argues we could exercise our pendent jurisdiction to decide on appeal.  For example, the Department urges us to consider its ripeness and standing challenges to the plaintiffs' funding claims.  Although we have the discretion to exercise our pendent jurisdiction to consider these issues, we decline to do so.  *See*

---

[16] The district court should address in the first instance how the plaintiffs can reconcile their concession that there are no constitutional issues with Louisiana's licensing statute or regulation with their burden to show a violation of the Constitution.

*Hosp. House, Inc. v. Gilbert*, 298 F.3d 424, 429 (5th Cir. 2002) (holding that when a court has "interlocutory appellate jurisdiction to review a district court's denial of [sovereign] immunity, [it] may first determine whether there is federal subject matter jurisdiction over the underlying case").

At oral argument, the plaintiffs conceded that on remand the Department will be able to bring a Rule 12(b)(6) motion to dismiss, raising ripeness, standing, and other jurisdictional objections.[17] Oral Argument at 24:33–25:20. The district court should carefully consider the Department's jurisdictional challenges before proceeding to the merits. Regarding ripeness, the plaintiffs allege that HB 606 will disqualify Gulf Coast from receiving Medicaid funds once Planned Parenthood "begins providing . . . abortions at the New Orleans Health Center," *i.e.*, if and when it receives a license. For a claim to be ripe, there must be a "hardship to the parties of withholding court consideration." *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012) (quoting *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 833 F.2d 583, 586 (5th Cir. 1987)). Given that it is unclear if and when Planned Parenthood will receive a license, it is difficult to see how the absence of a judicial decision on the hypothetical future impact of HB 606 causes the plaintiffs any harm in the present.[18]

Relatedly, the Department argued in the district court that the plaintiffs do not have standing because they have not suffered an injury. The

---

[17] Prior to this appeal, the district court permitted the Department to file only a Rule 12(b)(1) motion to dismiss. *See* Oral Argument at 24:47–24:58 ("The only motion that [the Department was] permitted to bring was a 12(b)(1) motion and make the immunity argument. . . . The district court was sequencing things.").

[18] The district court noted that purely legal questions are often ripe. But "even where an issue presents purely legal questions, the plaintiff must show some hardship in order to establish ripeness." *Choice Inc.*, 691 F.3d at 715 (quoting *Cent. & S. W. Servs., Inc. v. EPA*, 220 F.3d 683, 690 (5th Cir. 2000)).

bulk of the district court's jurisdictional analysis was not conducted plaintiff-by-plaintiff, despite the fact that the various plaintiffs occupy very different positions with respect to Louisiana's licensing scheme. But "standing is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996). And even if Planned Parenthood has standing to challenge the alleged constructive denial of its license application, it is unclear how such a constructive denial directly injures Gulf Coast or the Jane Does, who are patients of Gulf Coast's. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992) (describing the closer inquiry demanded when "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*"). The Jane Does do not appear to allege that they wish to receive abortion services at all—much less with the type of specificity that *Lujan* requires.[19] *See id.* at 564 (holding that plaintiffs failed to demonstrate an actual or imminent injury because they presented merely "'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be"). Moreover, our *en banc* court has held that Medicaid patients do not have an individual right to contest a State's determination that a particular provider is not qualified under Medicaid. *Kauffman*, 981 F.3d at 368; *see also id.* at 376 (Elrod, J., concurring).

The Department also argued that the district should abstain under *Burford*, 319 U.S. at 333–34. The district court rejected that argument

---

[19] The district court also stated that it is "well established that third parties may sometimes sue to protect the abortion rights of others." However, it cited only a case in which this court held that *physician-plaintiffs* had a sufficiently "'close' relationship" with their patients such that they could assert the patients' rights. *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 748 F.3d 583, 589 (5th Cir. 2014) (quoting *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004)). There are no physician-plaintiffs in this case. The plaintiffs here are two Planned Parenthood entities and three patients.

because the availability of a special state forum for resolution of licensing disputes was "unclear." Yet the Department notes that applicants allegedly injured by its licensing decisions may seek intra-Department review under state law,[20] and it admitted at oral argument that this review is available *now* to the plaintiffs. Oral Argument at 14:44–14:59. The Department estimated the length of that review process to be only "a matter of weeks." Oral Argument at 15:43. The Department further notes that a party dissatisfied with the result of intra-Department review may seek review in the appropriate parish district court under another state-law provision.[21]

The plaintiffs have not pursued these remedies. Indeed, when pressed to explain how they could maintain a procedural-due-process claim at all without having taken advantage of these state-law procedures—given the Department's concession that they are available—the plaintiffs only pointed out that they "don't just have a procedural-due-process claim, [they] also have an equal-protection claim and an undue-burden claim." Oral Argument at 21:46.

We expect the district court to carefully consider each jurisdictional challenge—including whether and how they impact each of the plaintiffs and each of the claims—before proceeding to the merits. *See In re Gee*, 941 F.3d 153, 159 (5th Cir. 2019) ("A district court's obligation to consider a challenge to its jurisdiction is non-discretionary."); *see also Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) ("[T]he plaintiff constantly bears the burden of proof that jurisdiction does in fact exist.").

---

[20] *See* La. Admin. Code, tit. 48, pt. I, § 4415(E).

[21] *See* La. Stat. Ann. § 49:964(B).

No. 18-30699

\* \* \*

The motion to dismiss the appeal is DENIED. The case is REMANDED for further proceedings consistent with this opinion.

JAMES C. HO, *Circuit Judge*, concurring:

The court today reaffirms on rehearing that sovereign immunity does not bar Plaintiffs from proceeding on one of their theories of relief. I concur.

I write to offer a few observations about some disparaging comments that Plaintiffs make throughout these proceedings. Plaintiffs repeatedly accuse Louisiana of bad faith and condemn its appeal as just "the latest step" in its "illegitimate[]" "years-long campaign" of "animus toward abortion."

But as the Supreme Court has made clear, "[m]en and women of good conscience can disagree . . . about the profound moral and spiritual implications of" abortion. *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 850 (1992). Millions of Americans believe that abortion is "nothing short of an act of violence against innocent human life." *Id.* at 852. Members of the *Casey* majority acknowledge that abortion is "offensive to our most basic principles of morality." *Id.* at 850. So Plaintiffs' comments conflict with the principle that "*both* sides of the [abortion] debate deserve respect." *Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265, 278 (5th Cir. 2019) (Ho, J., concurring in the judgment), *cert. granted*, 141 S. Ct. 2619 (2021).

This principle should apply with special force here. First, Louisiana officials have articulated good faith—and indeed serious—concerns in this case. Plaintiffs are under multiple federal and state criminal and regulatory investigations for mishandling fetal remains, and may well be disqualified from obtaining a license to operate, as our decision today explains. *See also Planned Parenthood of Greater Tex. v. Kauffman*, 981 F.3d 347 (5th Cir. 2020).

Moreover, Louisiana officials have publicly stated their objections to *Roe v. Wade*, 410 U.S. 113 (1973). *See*, *e.g.*, Brief for the States of Texas et al. as Amici Curiae, *Dobbs v. Jackson Women's Health Org.*, 141 S. Ct. 2619 (2021). They see no constitutional basis for a court to deny them the same authority to regulate abortion that they have over other areas of health care.

No. 18-30699

This too warrants respect. "Parties may litigate in anticipation of a good faith expectation of legal change." *United States v. Garza-De La Cruz*, 16 F.4th 1213, 1215 (5th Cir. 2021) (Costa & Ho, JJ., concurring) (quoting *Jackson Women's*, 945 F.3d at 277 (Ho, J., concurring in the judgment)) (cleaned up). It is "well within reason for litigants to ask whether the Supreme Court would reconsider [its precedent]." *Id.*

That is particularly true here. It's widely accepted that doctrines "[l]ike the *Roe* framework . . . are not, and do not purport to be, rights protected by the Constitution," but are "judge-made." *Casey*, 505 U.S. at 930–31 (Blackmun, J., concurring in part, concurring in the judgment in part, and dissenting in part) (quotations omitted). *See also id.* at 847 (same). The *Casey* majority simply held that, despite the admitted absence of supportive text, *stare decisis* must trump democracy, at least when it comes to abortion.

Moreover, the four dissenters in *Casey* strenuously begged to differ. They saw *Roe* as a grave threat to democracy. They compared *Casey* to *Dred Scott v. Sandford*, 60 U.S. 393 (1857), which they condemned for codifying a moral abomination without any support in constitutional text. 505 U.S. at 998, 1002 (Scalia, J., concurring in the judgment in part and dissenting in part). They bemoaned that *Casey* would only "prolong[] and intensif[y] the anguish" of our national struggle over abortion "by foreclosing all democratic outlet for the deep passions this issue arouses" and the chance for all sides to have "a fair hearing and an honest fight." *Id.* at 1000, 1002.[1]

---

[1] A number of lower court judges have expressed similar concerns—about both the absence of text and the lack of a principled theory of *stare decisis*—and have done so with increasing frequency in the months and years leading up to the grant of certiorari in *Dobbs*. *See*, *e.g.*, *Causeway Medical Suite v. Ieyoub*, 109 F.3d 1096, 1123 (5th Cir. 1997) (Garza, J., concurring specially) (comparing *Roe* with "*Dred Scott*, *Plessy*, and *Lochner*," in which "the Court made things worse by inserting itself into, and preempting, the national debate"); *McCorvey v. Hill*, 385 F.3d 846, 852–53 (5th Cir. 2004) (Jones, J., concurring) ("One may

No. 18-30699

_____

fervently hope that the Court will someday . . . re-evaluate *Roe* and *Casey* accordingly.'"); *Nat'l Abortion Fed'n v. Gonzales*, 437 F.3d 278, 296 (2nd Cir. 2006) (Walker, J., concurring) ("[I]n these abortion cases, the federal courts have been transformed into a sort of super regulatory agency—a role for which courts are institutionally ill-suited and one that is divorced from accepted norms of constitutional adjudication. . . . Is it too much to hope for a better approach to the law of abortion—one that accommodates the reasonable policy judgments of Congress and the state legislatures without departing from established, generally applicable, tenets of constitutional law?"); *id.* at 296 (Straub, J., dissenting); *MKB Management Corp. v. Stenehjem*, 795 F.3d 768, 774 (8th Cir. 2015) ("The Supreme Court has posited there are 'logical and biological justifications' for choosing viability as the critical point. But this choice is better left to the states, which might find their interest in protecting unborn children better served by a more consistent and certain marker than viability.") (citation omitted); *Planned Parenthood of Indiana and Kentucky, Inc. v. Comm'r of Indiana State Dep't of Health*, 888 F.3d 300, 313 (7th Cir. 2018) (Manion, J., concurring in the judgment in part and dissenting in part) ("today's outcome . . . begs for the Supreme Court to reconsider *Roe* and *Casey*"); *Whole Woman's Health v. Smith*, 896 F.3d 362, 376 (5th Cir. 2018) (Ho, J., concurring) ("The First Amendment expressly guarantees the free exercise of religion—including the right of the Bishops to express their profound objection to the moral tragedy of abortion, by offering free burial services for fetal remains. By contrast, nothing in the text or original understanding of the Constitution prevents a state from requiring the proper burial of fetal remains."); *West Alabama Women's Center v. Williamson*, 900 F.3d 1310, 1314, 1329 (11th Cir. 2018) ("Some Supreme Court Justices have been of the view that there is constitutional law and then there is the aberration of constitutional law relating to abortion. . . . [But] [i]n our judicial system, there is only one Supreme Court, and we are not it."); *id.* at 1330 (Dubina, J., concurring specially) ("the Court's abortion jurisprudence . . . has no basis in the Constitution") (citations omitted); *Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265, 277 (5th Cir. 2019) (Ho, J., concurring in the judgment) ("Nothing in the text or original understanding of the Constitution establishes a right to an abortion."); *Planned Parenthood of Greater Texas, Inc. v. Kauffman*, 981 F.3d 347, 385 (5th Cir. 2020) (Ho, J., joined by Duncan, J., concurring) (same); *Little Rock Family Planning Services v. Rutledge*, 984 F.3d 682, 692 (8th Cir. 2021) (Shepherd, J., joined by Erickson, J., concurring) ("I write separately . . . to reiterate my view that good reasons exist for the Supreme Court to reevaluate its jurisprudence regarding the viability standard as announced in [*Casey*].") (cleaned up); *id.* at 693 (Erickson, J., joined by Shepherd, J., concurring) ("I . . . write separately to emphasize my belief that there are important reasons for the Supreme Court to revisit its precedent in [*Casey*]."); *Preterm-Cleveland v. McCloud*, 994 F.3d 512, 538 (6th Cir. 2021) (Sutton, J., concurring) ("The more the federal courts do when it comes to abortion policy, and the longer they do it, the less reason there is for compromise at the local level. That has not been good for the federal courts or for obtaining more stable law over an issue unlikely to go away anytime soon."); *id.* at 546 (Bush, J., concurring) (noting "serious questions as to the correctness of the

24

No. 18-30699

\* \* \*

Plaintiffs' charge of "animus" recalls the words of Stephen Douglas, when he accused opponents of *Dred Scott* of "partisan malice." As Douglas put it, "whoever resists the final decision of the highest judicial tribunal, aims a deadly blow at our whole republican system of government." James W. Sheahan, THE LIFE OF STEPHEN A. DOUGLAS 284 (1860) (speech of June 12, 1857). These forces of "resistance" to *Dred Scott* are "enemies of the Constitution" who "would place all our rights and liberties at the mercy of passion, anarchy, and violence." *Id.*

Abraham Lincoln took a different point of view. "The sacredness that Judge Douglas throws around this decision, is a degree of sacredness that has never been before thrown around any other decision. I have never heard of such a thing." John G. Nicolay & John Hay, 1 ABRAHAM LINCOLN— COMPLETE WORKS COMPRISING HIS SPEECHES, LETTERS, STATE PAPERS, AND MISCELLANEOUS WRITINGS 255 (1894) (speech of July 10, 1858). Opposing *Dred Scott* "is not resistance, it is not factious, it is not even disrespectful." *Id.* at 228 (speech of June 26, 1857).

So too here. Louisiana officials have in good faith expressed sincere concerns about protecting the lives—and at least the dignity—of the unborn. Plaintiffs can dismiss all this as "illegitimate" if they want. But it is a matter that deeply troubles millions of Louisianans. And it is well within their rights to urge the Supreme Court to reconsider its views on the issue. I concur.

---

Supreme Court's abortion jurisprudence . . . as a matter of the Constitution's original meaning").